**INDEPENDENT BANKERS ASSOCIATION OF AMERICA, Appellant,**

v.

**John G. HEIMANN, Comptroller of the Currency of the United States Department of Treasury.**

**No. 78–2199.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 23, 1979.

Decided Dec. 28, 1979.

Rehearing Denied Feb. 1, 1980.

---

Samuel K. Abrams, Washington, D.C., with whom Thomas J. Segal, Brian E. Moran, Washington, D.C. and Horace R. Hansen, St. Paul, Minn., were on the brief, for appellant.

Michael J. Ryan, Asst. U. S. Atty., Washington, D.C., with whom Earl J. Silbert *, U. S. Atty., John A. Terry, Michael W. Farrell, David H. Shapiro, Asst. U. S. Attys., and Thomas P. Vartanian, Dorothy A. Sable, Attys., Washington, D.C., were on the brief, for appellee.

* United States Attorney at the time the brief was filed.

** Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. The regulation, which took effect January 1, 1978, is codified at 12 C.F.R. § 2 (1979).

Before McGOWAN and WILKEY, Circuit Judges and GESELL **, United States District Judge for the District of Columbia.

Opinion for the Court filed by District Judge GESELL.

GESELL, District Judge.

This is an appeal from an Order of the District Court dismissing a complaint filed by Independent Bankers Association of America ("IBAA"). IBAA seeks to enjoin the Comptroller of the Currency of the United States from continuing to enforce a regulation entitled "Disposition of Credit Life Insurance Income," 42 Fed.Reg. 48518–26 (1977).[1] The challenged regulation prevents insiders of national banks from benefitting personally by the regular receipt of credit life insurance income sold to borrowers of such banks. Appellant contends that the Comptroller exceeded his legal authority under the national banking laws when he promulgated the regulation, and that he acted arbitrarily and contrary to other specific federal and state laws.

The District Court in effect held that since the Comptroller was proceeding to enforce the regulation by entering cease and desist orders against individual noncomplying national banks, IBAA's broad attack against the regulation as a whole should not be entertained.[2] Thus the lower court's ruling left resolution of the issues to piecemeal litigation, a course urged by the Comptroller. We reject this approach. After finding that the issue of the regulation's validity is ripe for judicial review and that IBAA has standing, we consider the merits and hold that the Comptroller's credit life regulation is authorized by law and is neither arbitrary nor capricious. We therefore uphold the regulation against appellant's challenge, without necessity for remand to the District Court.

2. See *Independent Bankers Assn. of America v. Heimann*, No. 77–2189 (D.D.C. Sept. 13, 1978, *modified* Oct. 11, 1978), *reproduced at* Appellant's Appendix (AA) 247a–252a.

## STANDING AND RIPENESS

■ IBAA is a nonprofit trade association representing approximately one-half of all commercial banks in the United States, including 1,950 national banks directly affected by the regulation in dispute. It participated as the representative of its members in the rulemaking proceeding and is fully qualified and authorized to represent their interests. The complaint alleges and a subsequent affidavit supports IBAA's claim that the regulation has an immediate and direct impact on its national bank members by requiring these member banks to abandon established practices for the provision of credit life insurance.[3] IBAA contends that the Comptroller is forcing appellant's members to choose between switching to more costly and otherwise illegal insurance sales methods or risking civil prosecution with its attendant loss of public confidence. This is more than sufficient to establish a direct injury in fact. *See Duke Power Co. v. Carolina Env. Study Group*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978).

The injury asserted is, moreover, both a generalized competitive impact and a specific financial detriment. Because such economic concerns of this highly regulated banking industry are committed by statute to the authority of the Comptroller,[4] appellant has satisfied the zone of interest test. *See Barlow v. Collins*, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); *Association of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Although the regulation is as the Comptroller suggests directed primarily to activities of insiders and not to the banks themselves, the regulated activities are entirely intermeshed with the day-to-day functions of

national banks. We have recognized IBAA's standing in comparable situations in the past and will do so again here.[5]

■ It is further evident that the issues raised by the complaint are ripe for decision. The Comptroller states that he fully intends to enforce the credit life regulation through all appropriate means. This includes both public administrative proceedings pointed toward cease and desist orders and negotiated compliance agreements.[6]

The Comptroller would apparently prefer to see the validity of the regulation litigated over the ensuing years, Circuit-by-Circuit. He has, however, taken final agency action in issuing the regulation and the legal issues raised by the complaint can be resolved without need of case-by-case factual development. *See generally Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). As indicated above, the hardship to appellant is sufficiently direct and immediate to confer standing. Such being the case, prompt resolution will eliminate uncertainty and be in the interest of efficient judicial administration.

■ Although the case could now be remanded to the District Court for a decision on the merits, we have concluded that such a course is unnecessary and indeed would be unduly wasteful of judicial resources. A full record is before us, devoid of issues of disputed material fact. The parties cross-moved for summary judgment in the lower court and the relevant legal questions have been fully briefed and argued on appeal. This Court sees no benefit to be gained by delay. *See* 28 U.S.C. § 2106. *See generally Grosso v. United States*, 390 U.S. 62, 71–72, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968).

3. *See* Complaint at ¶¶ 9–15; Affidavit of Richard W. Peterson, Dec. 21, 1977 at ¶¶ 4–10, *reproduced at* AA 7a–12a; 42a–47a.

4. *See* 12 U.S.C. §§ 21 *et seq.* (1976). *See generally Investment Co. Institute v. Camp*, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971).

5. *See Independent Bankers Assn. of America v. Smith*, 402 F.Supp. 207 (D.D.C. 1975), aff'd, 175 U.S.App.D.C. 184, 534 F.2d 921 (D.C. Cir.), cert. denied, 429 U.S. 862, 97 S.Ct. 166, 50

L.Ed.2d 141 (1976); *Independent Bankers Assn. of America v. Heimann*, No. 78–0811 (D.D.C. Oct. 30, 1978).

6. At oral argument the Comptroller represented that his office had initiated enforcement under the regulation three times since January, 1978. On each occasion, administrative proceedings ended in a consent order; enforcement through cease and desist orders has not been necessary.

## THE COMPTROLLER'S RULEMAKING AUTHORITY

The Comptroller initiated the rulemaking proceeding in aid of his statutory responsibilities under the Financial Institutions Supervisory Act of 1966,[7] 12 U.S.C. § 1818. Section 1818(b) expressly authorizes the Comptroller in his discretion to proceed to issue cease and desist orders against national banks engaged in an "unsafe or unsound" banking practice or violating "a law, rule or regulation" the Comptroller may issue. Under Section 1818(n) the Comptroller is "empowered to make rules and regulations" with respect to any proceeding initiated pursuant to this section.

The challenged regulation relating to disposition of credit life insurance income is designed to identify what the Comptroller has determined to be an unsafe and unsound banking practice. The regulation is not complex. It prohibits officers, directors and principal shareholders of national banks from retaining for their own benefit income derived from the sale of credit life insurance in connection with loans made by the bank.[8]

Credit life insurance[9] originated early in this century as a security device to protect the extension of consumer credit by banks. It is today a principal form of security routinely obtained by national banks making consumer loans. Formal tying arrangements between the extension of credit and the sale of such insurance are prohibited by statute.[10] However, the receipt by officers and others of personal commissions from credit life insurance sales may well stimulate overselling to potentially uninterested borrowers, often without disclosure to the full board of directors or at the cost of diminished attention to the bank's own investment priorities.[11] The Comptroller, conscious of fiduciary principles, sought to avoid the obvious conflict of interest which is present when insiders personally benefit from bank functions through what is, in effect, a form of self-dealing. Finding such diversions of income from the banks to be unsafe and unsound, the Comptroller prohibited the practice while suggesting a variety of flexible procedures still available to national banks enabling them to benefit from credit life insurance income generated by their loan activities.[12]

Because the statute is ambiguous and fails to contain an express grant of authority to define "unsafe and unsound" practices the authority of the Comptroller to define such a practice by rule is strenuously questioned in this proceeding. Appellant urges the Court to find that in view of Congress's unwillingness to authorize issuance of substantive regulations, the challenged publication is no more than an interpretative statement, not entitled to status as a binding rule. *See Batterton v. Francis*, 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977); *General Electric Co. v. Gilbert*, 429 U.S. 125, 141, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976).

■ There is little room for doubt, however, that the Comptroller is proceeding as Congress contemplated. National banks are perhaps as meticulously regulated as any industry. Every aspect of their affairs is scrutinized to assure financial soundness and ethical practice. The Comptroller's statutory duties require the closest monitoring and continuous supervision of these institutions.[13] Thus, the Comptroller's discre-

---

7. Pub.L.No. 89–695; 80 Stat. 1046.

8. *See* 12 C.F.R. § 2.4(a) (1979).

9. The term "credit life insurance" encompasses health, accident or life insurance coverage issued as protection for a loan. *See* 12 C.F.R. § 2.3(e) (1979).

10. 12 U.S.C. § 1972 (1976).

11. *See* 42 Fed.Reg. 48523–24 (1977) (statement of reasons accompanying final regulation).

12. *See* 12 C.F.R. § 2.6(a) through (g) (1979) (listing alternatives).

13. *See generally* 12 U.S.C. §§ 21 *et seq.* (1976). One commentator has characterized regulation of national banks as:

> more intensive than the regulations of any other industry, and . . . extends to all major steps in the establishment and development of a national bank, including not only entry into the business, changes in status,

tionary authority to define and eliminate "unsafe and unsound" conduct is to be liberally construed.

Indeed, as the language of Section 1818(b) itself suggests, a regulation giving advance notice of conduct which the Comptroller disapproves as threatening to the safety and soundness of the banks he regulates is wholly consistent with the statutory scheme. The Comptroller was given authority to promulgate regulations in order to facilitate execution of his statutory powers. *See* 12 U.S.C. § 1818(n). It would undermine the regulatory purpose of Congress to assume that the Comptroller must proceed solely by separate "cease and desist" cases. His ability to forewarn by specifying and clarifying the nature and scope of his concerns will at the same time minimize the necessity for recurrent and costly investigation into the conduct of the many individual banks under his supervision.

■ This Court has had occasion in a closely analogous context to consider the authority of the Federal Trade Commission to implement its mandate over "unfair and deceptive" practices through regulation. Considerations of specific language and overriding statutory purpose which led to a recognition of that Commission's substantive rulemaking authority are equally and forcefully applicable to the case at hand. *See National Petroleum Refiners Assn. v. FTC,* 482 F.2d 672, *cert. denied,* 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1973). The statutory provisions analyzed in *National Petroleum* are wholly comparable to those on which the Comptroller here relies.[14] Moreover, as in *National Petroleum,* we see no reason to impose a restrictive procedural gloss on the agency's authority "to make rules and regulations" when a properly promulgated substantive rule unquestionably effectuates the statutory plan. *See id.* at 678. Absent a clear congressional expression to the contrary,[15] the Comptroller is entitled to accomplish his regulatory responsibilities over "unsafe and unsound" practices both by cease and desist proceedings and by rules defining and explicating the practices which in his discretion he finds threatening to a stable and effective national bank system.[16]

## THE REGULATION AND OTHER LAWS

■ IBAA next contends that the credit life regulation, by approving various methods which enable national banks themselves to provide credit life insurance,[17] violates other laws regulating the business of insur-

consolidations, reorganizations, but also the most intensive supervision of operations.
. . .
1 K. Davis, Administrative Law Treatise 247 (1958).

**14.** *Compare* 12 U.S.C. §§ 1818(b) *and* 1818(n) *with* 15 U.S.C. §§ 45(b) *and* 46(g). Each statute confers authority to police unhealthy practices, broadly defined (*i. e.,* "unsafe and unsound practices" in banking: "unfair or deceptive act[s] or practice[s]" in commerce), and to promulgate regulations in aid thereof.

**15.** We reject appellant's contention that unsuccessful efforts during the 95th Congress to legislate with respect to the Comptroller's general rulemaking authority convey such a narrowing of congressional intent. In fact, the legislative history indicates an understanding that the explicit rulemaking authorization proposed in Title XIV of the House bill reported out of committee was meant to clarify existing agency powers, rather than create new authority. *See* H.R.Rep.No.1383, 95th Cong., 2d Sess. 29 (1978), *reprinted in* [1978] U.S.Code Cong. &

Admin.News pp. 9273, 9301. The failure to ratify this authorization was attributable to time constraints during the final hours of the 95th Congress. *See* 124 Cong.Rec. H13075 (daily ed. Oct. 14, 1978) (remarks of Rep. St. Germain).

**16.** Because we hold that Section 1818(b) and (n) constitutes an explicit grant of rulemaking authority applicable to the instant regulation, it is unnecessary to consider whether or not the Comptroller, in any event, has inherent rulemaking authority to issue rules consistent with statutory objectives.

**17.** These methods include having bank employees who sell the insurance turn over all income to the bank as compensation for the use of its premises and good will (12 C.F.R. § 2–6(d)), refunding all such income to the loan customers (12 C.F.R. § 2.6(g)) and several other options. The list in § 2.6 is not meant to be exhaustive; moreover, no single method is mandatory under the regulation.

ance. One statute purportedly in direct conflict with the challenged rule is 12 U.S.C. § 92 (1976). This legislation authorizes national banks in towns of 5,000 inhabitants or less to act as agents for life insurance companies; in appellant's view its language carries a clear implication that national banks in larger towns have no authority to so perform.[18] Unlike other forms of insurance coverage, however, credit life insurance is a limited special type of coverage written to protect loans. In no way does it involve the operations of a general life insurance business whether written in a town of over or under 5,000 inhabitants. Moreover, Congress has specifically granted national banks all incidental powers necessary to carry on the business of banking, 12 U.S.C. § 24 (1976), and as the record thoroughly establishes credit life insurance is now commonplace and essential where ordinary loans on personal security are involved.[19]

The authorities cited by appellant, such as *Saxon v. Georgia Assn. of Independent Insurance Agents, Inc.,* 399 F.2d 1010 (5th Cir. 1968), and *Commissioner of Internal Revenue v. First Security Bank of Utah, NA,* 405 U.S. 394, 92 S.Ct. 1085, 31 L.Ed.2d 318 (1974), are simply not in point. The first case did not involve credit life but rather banks' authority to sell broad forms of automobile, home, casualty and liability insurance. *See Saxon, supra,* 399 F.2d at 1012. The second involved no direct holding on the issue presented in this litigation.[20]

■ IBAA also suggests that the McCarran-Ferguson Act must be interpreted as prohibiting the credit life regulation since the regulation conflicts irreconcilably with some state insurance laws.[21] While it is true that the Act preserves to the states authority to regulate the relationship between the insurance company and its policyholder, *Securities & Exchange Commission v. National Securities, Inc.,* 393 U.S. 453, 460, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), a rule affecting the disposition of credit life insurance income received by national bank insiders does not fall within the strictures of the statute. Nothing in the McCarran-Ferguson Act was intended to affect the power of the Comptroller under authority of Congress to regulate "unsafe and unsound" banking practices of national banks. This exercise of power over income dispensed internally among national bank personnel lies well beyond the core of protection furnished to state insurance laws under the Act. *See generally, Group Life & Health Insurance Co. v. Royal Drug Co.,* 440 U.S. 205, 210–14, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979). To be sure, the states may

---

**18.** Under 12 U.S.C. § 92, a national bank's authority to function as an agent is subject to such rules and regulations as the Comptroller may prescribe. By its own terms, the statute does not address the authority of national banks in larger towns or cities to act as agents for life insurance companies.

**19.** In an analogous context, the Federal Reserve Board has found the sale of credit life insurance "so closely related to banking or managing or controlling banks as to be a proper incident thereto." *See* 12 U.S.C. § 1843(c)(8) *and* 12 C.F.R. §§ 225.4(a)(9)(ii), 225.128(c). This finding has been sustained on judicial review. *Alabama Assn. of Insurance Agents v. Board of Governors of Fed. Res. Sys.,* 533 F.2d 224, 240–41 (5th Cir.), *modified,* 558 F.2d 729, 730 (1977), *cert. denied,* 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978).

**20.** The Supreme Court in *First Security Bank of Utah, supra,* 405 U.S. at 401–02, 92 S.Ct. 1085, simply adopted the litigants' assumption that a national bank in a town of more than 5,000 persons could not legally receive commission income for the sale of credit life insurance. That case involved the allocation, for tax purposes, of commissions earned in the sale of credit life insurance; the Court's "assumption" decided nothing concerning the meaning of 12 U.S.C. § 92. *See First Natl. Bank of La Marque v. Smith,* 436 F.Supp. 824, 832 (S.D.Tex.1977).

**21.** Under the McCarran-Ferguson Act, Pub.L. No.79–15, 59 Stat. 33 (1945), codified in 15 U.S.C. §§ 1011 *et seq.* (1976), the business of insurance is subject to regulation by the states. Although appellant cites state laws in Oklahoma and Texas allegedly superseded by the challenged rule, its argument is not persuasive. Given that credit life insurance is entirely optional under the regulation, and that alternative methods for its sale are explored in depth at the state level, we are satisfied that the regulation will not cause national banks to violate these state laws.

continue to regulate. All that is involved is the Comptroller's proper concern that banks under his supervision are not deprived of the benefits of business they generate by those who seek to take advantage of their positions as officers, directors or principal shareholders.

 Appellant's claim for loss of competitive equality with state banks is without merit. There is no support from Congress or the courts for requiring such equality between state and national banks with respect to provision of credit life insurance or indeed in general. An extensive and longstanding network of statutory requirements governing national banks alone confirms the existence of a dual banking system. Moreover, it is puzzling if not inappropriate for banks to claim they are experiencing a "competitive disadvantage" as a result of a regulation which can only increase the earnings of banks themselves.

## RULEMAKING PROCEDURES

Finally, IBAA points to the fact, raised during the rulemaking proceedings, that the Federal Deposit Insurance Corporation ("FDIC"), which supervises and insures most state-chartered banks, has evolved less stringent regulations for dealing with the writing of credit life insurance by insiders. Appellant urges that the Comptroller's failure to address these more flexible alternative approaches in announcing the regulation artificially narrowed the scope of the proceedings in violation of accepted rulemaking standards. *See Home Box Office, Inc. v. FCC,* 185 U.S.App.D.C. 142, 567 F.2d 9, 36 (D.C. Cir.), *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977); *United States v. Nova Scotia Food Products Corp.,* 568 F.2d 240, 253 (2d Cir. 1977).

The Comptroller received some 200 comments over a fifteen-month period. He was not required to meet each separate comment head on when issuing his determination following the comment period. *See Automotive Parts & Accessories Assn. v. Boyd,* 132 U.S.App.D.C. 200, 407 F.2d 330,

338 (D.C. Cir. 1968). His task instead was to identify vital material questions raised during the proceedings and indicate the agency's response to these concerns. *See Home Box Office, Inc. v. FCC, supra; Automotive Parts & Accessories Assn. v. Boyd, supra.* This he did, facing directly both the principal legal and management objections in a full reasoned discussion.[22] His "concise general statement" was sufficient. There were no procedural errors in the announcement, promulgation or explanation of the challenged regulation.

Given the Comptroller's clear authority to regulate national banks so as to achieve sound banking practice, and the obvious conflict between congressional objectives and the credit life insurance activities of insiders prohibited by the regulation, we cannot find that the Comptroller has acted arbitrarily. According due deference to his expertise and finding no procedural or substantive infirmity, the regulation must be sustained. The District Court's order dismissing the complaint is affirmed on different grounds.

---

22. *See* 42 Fed.Reg. 48518–25 (1977).