**LINCOLN SAVINGS AND LOAN ASSOCIATION, Plaintiff,**

v.

**FEDERAL HOME LOAN BANK BOARD, et al., Defendants.**

Civ. A. No. 87–0734.

United States District Court, District of Columbia.

Oct. 2, 1987.

Carter G. Phillips, Mark D. Hopson, Washington, D.C., for plaintiff Lincoln Sav. & Loan Assn.

Thomas J. Segal, Loretta R. Pitt, David Eisenstein, Charlotte Kaplow, Washington, D.C., for defendants Federal Home Loan Bank Bd. and Edwin Gray, Chairman.

## MEMORANDUM

GESELL, District Judge.

Plaintiff Lincoln Savings and Loan Association ("Lincoln"), is a state-chartered, federally-insured thrift doing business in California. Lincoln challenges the Federal Home Loan Bank Board's (the "Board") Direct Investment Rule (the "Rule"), 52 Fed.Reg. 8188 (1987) (to be codified at 12 C.F.R. § 563.9–8) on two grounds: first, that the Board lacked statutory authority to adopt this regulation; and, secondly, that the rule, in any event, is arbitrary, capricious and an abuse of discretion. The parties have filed cross-motions for summary judgment and a hearing has been held.

As a result of the Great Depression, Congress created a federal insurance-of-accounts system to restore public confidence in the security of thrift institutions such as Lincoln and to ensure a sound and economical means of home financing. The Federal Savings and Loan Insurance Corporation ("FSLIC") fund reimburses a thrift depositor for savings lost through the failure of a savings and loan association. It is the statutory duty of the Board to administer the FSLIC fund and to this end the Board was granted extensive statutory authority. *See* Federal Home Loan Bank Act of 1932, ch. 522, 47 Stat. 725, codified at 12 U.S.C. §§ 1421–1449 (1982); National Housing Act of 1934, Title IV, ch. 847, 48 Stat. 1255, codified at 12 U.S.C. §§ 1724–1730 (1982).

In the past five years, unprecedented stress has been placed on the FSLIC fund because of the number of thrifts which have recently failed or come into financial difficulty that threatened failure. The Board, after investigation, found a correlation between these emerging financial difficulties and the increasing trend of state-chartered thrifts to purchase "direct investments"—a term that describes investments in a wide variety of commercial ventures, including equity securities and real estate.[1]

---

1. The Board formally defines "direct investments" as investments in equity securities, real estate, service corporations, and operating subsidiaries. 12 C.F.R. § 563.9–8(b)(1) (1987).

Such investments, the Board concluded, pose greater risks to the financial health of thrifts than do mortgage loans to facilitate purchase of homes, the traditional business of the thrifts.

Seeking to reduce the perceived risk of such investments, the Board issued a proposed direct investment rule in May, 1984. Following formal rulemaking procedures, including a notice and comment period, and after reviewing extensive studies by experts, the Board promulgated its first direct investment rule on January 31, 1985. *See* 50 Fed.Reg. 6912 (Feb. 19, 1985). After two years of additional study and practical experience, with expiration of this initial rule set for January 1, 1987, the Board held yet another formal rulemaking proceeding that extended from September, 1986 until the end of February, 1987. The Board studied performance under the earlier rule, performed additional studies, solicited comments and held public hearings as well. After this exhaustive process in which all relevant factors were considered,

the Board then promulgated the present Rule.

This Rule sets a threshold level for direct investments by individual thrifts beyond which the thrift cannot make such investments without prior approval from the Board.[2] Lincoln was refused approval for additional direct investment, a circumstance that apparently precipitated filing of the present complaint.[3]

Lincoln first claims the Board had no authority to adopt the rule. It contends that enabling legislation does not authorize the Board to issue substantive regulations in an area where the states have traditionally regulated because Congress has not specifically indicated such authority. It reinforces this argument by reference to the dual regulatory scheme traditionally recognized by Congress, under which the states retain primary regulatory authority. Thus it suggests that the Board was intended to play only a minimal role—that of protecting the FSLIC fund. Under Lincoln's view of the enabling statutes the Board possesses no general rulemaking authority to sup-

**2.** The Rule provides that FSLIC insured thrifts may make direct investments without Bank approval only up to the following established threshold levels:

> (1) If an institution meets its regulatory capital requirements and has tangible capital equal to or exceeding 6% of "total liabilities" it may make direct investments up to three times tangible capital as calculated at the end of the immediately preceding months.
> (2) If an institution meets its regulatory capital requirements and has tangible capital less than 6% of "total liabilities" it may make direct investments up to the greater of (a) 3% of assets, or (b) 2.5 times tangible capital as calculated at the end of the immediately preceding month.
> (3) If an institution fails to meet its regulatory capital requirements it may not make direct investments.

12 C.F.R. § 563.9–8(c)(2)(i)–(iii) (1987).

**3.** Lincoln sought to exceed the limit for direct investment and was denied approval by the Board after pursuing the procedures provided for in the predecessor rule. As to the procedures for determining waiver of the threshold prohibition, a key difference between the original direct investment rule and the amended Rule is the elaboration of standards that the Board requires the Principal Supervisory Authority ("PSA") to employ in reviewing a thrift's request to exceed its direct investment thresh-

old. The Rule contains detailed guidelines setting forth specific factors which a PSA must identify before denying an application. *See* 52 Fed.Reg. 8188, 8206 (1987) (to be codified at 12 C.F.R. §§ 563.9–8(g)(3)(ii)(A)–(D)). These guidelines provide a comprehensive and fair process that considers both the individual thrift's and chartering state's interests in balance with the statutory objectives of the Board.

Sections 563.9–8(g)(1)–(5) establish the procedures to be followed in applying for an exception to the Rule. If the thrift is state chartered, a copy of the application must be served by the institution on the state supervisor of savings and loans. Within ten days of receipt of the application the PSA must either notify the institution that all required information has been submitted or make a request for additional information. Within thirty days of notification that all information has been received, the PSA with the concurrence of the state supervisor, must act on the application or it is deemed approved. If the PSA and state supervisor are unable to agree on the action to be taken then the PSA must refer the application to the FSLIC in Washington for decision. If the application is denied by the PSA then the institution may file with the FSLIC a petition for reconsideration. When an application comes to FSLIC, either by referral from the PSA or by petition for reconsideration by the institution, FSLIC must act within thirty days or the application for petition is deemed granted.

plant state investment rules for thrifts and the sole mechanism for dealing with unsafe and unsound thrift investment practices is the Board's cease-and-desist power to be exercised through case-by-case adjudication. Certainly this argument becomes sharply focused here inasmuch as Lincoln is authorized under California law to make unlimited direct investments.

Since its creation the Board has issued and enforced substantive regulations that govern the operation of federally-chartered thrifts and state-chartered associations insured by the FSLIC.[4] The Board is not manacled in the manner Lincoln suggests, as the statutory language, the legislative history, and case law will readily indicate. To carry out its responsibility as head of the FSLIC, Congress granted the Board authority to promulgate "rules and regulations ... for carrying out the purposes" of the National Housing Act ("NHA"). 12 U.S.C. § 1725(a) (1982). Among the purposes of the NHA are the development and maintenance of a safe and economical system of home financing as well as the protection of the FSLIC fund from excessive risk.[5]

■ Here, as in other instances, it is clear that the Rule is intended to serve the stated purposes of the NHA. Consistent with these purposes, the Rule functions "to allow institutions the flexibility to exercise their investment powers, as independently authorized by applicable law, in a manner that would expose neither the institutions themselves nor the FSLIC insurance fund to an unacceptable level of risk" and "to ensure that these institutions continue to fulfill their obligations to provide economical home financing." 52 Fed.Reg. 8188 (1987).

In addition to section 1725(a), the Board also relied on Section 407 of the NHA, 12 U.S.C. §§ 1730(e) and 1730(m)(3) (1982), in promulgating the Rule. These provisions empower the Board to issue cease and desist orders upon determination by it that an association is engaged in unsafe and unsound practices. Section 1730(e) elaborates this general cease and desist authority and reads in relevant part:

> [W]henever, in the opinion of [FSLIC] an insured institution ... is engaging or has engaged ... in an unsafe or unsound practice ... or is violating or has violated ... a law, rule, or regulation ... [FSLIC] may ... issue ... an order to cease and desist from any such violation or practice.

Section 1730(m) then provides: "In the course of or in connection with any proceeding under this section, the Corporation ... is empowered to make rules and regulations with respect to any such proceedings."

In *Independent Bankers Ass'n of America v. Heimann*, 613 F.2d 1164 (D.C.Cir. 1979), the Court of Appeals interpreted provisions of the Financial Institutions Supervisory Act of 1966 that mirror the provisions at issue here. *See* 12 U.S.C. §§ 1818(b) and 1818(n) (1982). The Court held that these provisions authorize the Comptroller of the Currency to issue substantive rules concerning banks and bank personnel that engage in unsafe and unsound practices. Section 1818(b) authorizes the Comptroller to take administrative enforcement action, including the issuance of cease and desist orders, against banks and bank personnel that engage in unsafe and unsound practices, among other things. Section 1818(b) in turn authorizes the Comptroller "to make rules and regulations with respect to any such proceedings." The Court of Appeals in finding that the statute fully authorized promulgation of substantive rules stated:

---

4. For an example of substantive regulations—applicable to both state-chartered and federally-chartered institutions—issued by the Board under authority contained in 12 U.S.C. §§ 1725(a) and 1730, see 35 Fed.Reg. 18038 (1970).

5. Section 403(c) of the NHA, 12 U.S.C. § 1726(c) (1982), provides, for example, that the FSLIC may reject a state chartered institution's applica-

tion if its "home financing policy is inconsistent with economical home financing or with the purpose of this subchapter." *See also* 78 Cong. Reg. 11196, 11198 (June 12, 1934) (statements of Rep. Reilly and Rep. Williams); 78 Cong.Rec. 12013–15 (June 16, 1934) (Senate statement of objectives of National Housing Act).

It would undermine the regulatory purpose of Congress to assume that the Comptroller must proceed solely by separate "cease and desist" cases. His ability to forewarn by specifying the nature and scope of his concerns will at the same time minimize the necessity for recurrent and costly investigation into the conduct of the many individual banks under his supervision.

*Id.* at 1169. Considerations of specific language and overriding purposes of the regulatory scheme which led to the Court's recognition of the Comptroller's authority to promulgate substantive regulations are equally applicable to the case at hand.

As additional authority, the Board also relies on section 17 of the Federal Home Loan Bank Act ("Bank Act"), 12 U.S.C. § 1437(a) (1982). This section grants the Board the "power to adopt, amend, and require the observance of such rules, regulations, and orders as shall be necessary for carrying out the purposes of this [Act]." *Id.* Like the National Housing Act, the basic purpose underlying the Bank Act is to provide a system for secure and economical home financing. Concomitant to this purpose is the Board's duty to ensure that members do not take investment risks that would undermine the proper functioning of the insurance-of-accounts system and its objectives. The Direct Investment Rule is wholly consistent with these purposes and thus is authorized by section 17.

Moreover, even assuming legislative history is ambiguous, the understanding of later Congresses is clear as to the Board's authority. A Report of the House Committee on Government Operations captioned "Federal Regulation of Direct Investments By Savings and Loan Associations," H.R. Rep. No. 358, 99th Cong., 1st Sess. 14 (Nov. 5, 1985), concluded that "[a]s long as the FSLIC fund remains impaired ... the committee finds that the Federal Home Loan Bank Board's direct investment rule ... is an appropriate and necessary restriction." The Report further stated that the Board's Rule "because of [its] elements of flexibility, may even be useful as a model for other Federal agencies facing rapid change in the industries and markets they regulate.... Because it does not set a restrictive rule in concrete but openly acknowledges the need for continuing review and fine tuning, this rule deserves credit as an example of responsive regulation under difficult circumstances." *Id.* at 40. Further, on March 25, 1987, an amendment to Senate Bill 790 was offered which would have added to Section 402(c) of the NHA, 12 U.S.C. § 1725(c), the following language: "To issue such rules, regulations, and orders as necessary to define any terms used in this Act, and administer and carry out its purposes, including regulation of unsafe or unsound practices by insured banks." 133 Cong.Rec.S. 3812–3813 (daily ed. March 25, 1987). Later that section was deleted. The reason for the deletion, according to Senator William Proxmire, Chairman of the Senate Banking Committee, was that "the FSLIC already has such authority under existing law." 133 Cong.Rec.S. 3961 (daily ed. March 26, 1987) (statement of Sen. Proxmire). While the "views of subsequent Congresses cannot override the unmistakable intent of the enacting one, *Teamsters v. United States,* 431 U.S. 324, 354 n. 39 [97 S.Ct. 1843, 1864 n. 39, 52 L.Ed.2d 396] (1977), such views are entitled to significant weight, *NRLB v. Bell Aerospace Co.,* 416 U.S. 267, 275, [94 S.Ct. 1757, 1762, 40 L.Ed.2d 134] (1974)." *Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. 572, 596, 100 S.Ct. 800, 813, 63 L.Ed.2d 36 (1980). The unmistakable intent of subsequent Congresses, thus, fully supports the authority of the Board to issue the Direct Investment Rule.

■ Finally, the Rule is neither inconsistent with the functioning of a dual system of banking regulation nor an attempt by the Board to expand its authority beyond what was envisioned by Congress. FSLIC insurance, in the case of state-chartered associations, is voluntary and becomes effective only if such institutions apply for it and are accepted. As a condition for eligibility under the program, state-chartered thrifts agree to inspection and regulation by the Board. The Board, moreover, possesses the ultimate authority of terminating an association's insurance if

it finds that institution engaging in unsafe and unsound practices. Here, the Rule "requires Board supervision of the exercise of those powers, with input from state authorities, only when the level of investment may pose significant risk to the FSLIC fund or may be detrimental to, or incompatible with, economical home financing." 52 Fed.Reg. 8188 (1987). This is not an unreasonable intrusion upon the exercise of state granted powers by state-chartered, federally-insured thrifts. The concept of dual regulation simply does not require the Board to abdicate its responsibility to carry out the purposes that Congress intended in creating an insurance-of-accounts system; rather, it requires proper respect for state regulatory autonomy within the framework, purposes, and objectives of the system.

Lincoln, however, wants more than a functioning system of home financing that properly respects state regulatory autonomy. It seeks to have the best of both worlds. On the one hand, it wants to be governed solely by California regulations which permit it unlimited direct investment without regard to the risk. On the other hand, it wants the FSLIC as a safety-net in case its direct investment ventures go awry —even if it means impairment of the fund.

Obviously, this is not the system of dual banking regulation that Congress intended. The insurance-of-accounts system was created to deal with emergency conditions existing at the time and such threatening conditions as might arise in the future. Congress intended the Board to function as a permanent institution carrying out the purposes for which it was created: the maintenance of a sound and economical means of home financing and the concomitant protection of the FSLIC fund. The Federal Home Loan Bank Board is fully authorized by statute to promulgate the Direct Investment Rule for protection of the FSLIC fund.

■ The remaining issue is whether the Rule in some respect is arbitrary, capricious and an abuse of discretion. Lincoln argues that the promulgation of the Rule was arbitrary and capricious because:

(1) the Board failed to consider the interaction between the Rule and the existing system of state regulation;

(2) the Board failed to draw a rational link between its factual conclusions and the Rule; and,

(3) the Board's factual conclusions are not supported by sufficient evidence to satisfy the arbitrary and capricious standard.

These contentions are wholly unsupported by the factual record. As already described, the rulemaking process was exhaustive and all the relevant factors necessary for an informed and reasoned decision were considered before the Board promulgated the Rule. In light of the fact that the Board considered these factors and arrived at a reasoned decision informed by its expertise, this Court finds, in applying the appropriate standard of review, that Lincoln's claim in this regard is also without merit. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. E.P.A.,* 768 F.2d 385, 389 n. 6 (D.C.Cir.), *cert. denied, American Methyl Corp. v. Motor Vehicle Mfrs. Ass'n of U.S., Inc.,* 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed. 2d 892 (1986) (court must engage in "searching and careful" review of facts and agency's reasoning to ensure agency's decision was "product of reasoned decision-making based upon a consideration of relevant factors").

Accordingly, the Board's motion for summary judgment is granted and Lincoln's motion for summary judgment is denied. The Clerk of Court shall enter judgment for the Board. The complaint is dismissed.

SO ORDERED.