**FIRST NATIONAL BANK OF EAST-
ERN ARKANSAS, A National
Banking Association, Plaintiff,**

v.

**Robert M. EUBANKS, III, Commissioner
of the Insurance Department for the
State of Arkansas, Defendant,**

**Arkansas Credit Insurance
Association, Intervenor.**

**No. LR–C–87–629.**

United States District Court,
E.D. Arkansas, W.D.

Jan. 25, 1989.

Phil Hicky, Butler, Hicky & Routon, Forrest City, Ark., for plaintiff.

Allan W. Horne, and Chet Roberts, Davidson, Horne & Hollingsworth, Little Rock, Ark., for intervenor.

David B. Simmons, Asst. Com'r, Chief Counsel, Little Rock, Ark., for defendant.

## MEMORANDUM OPINION AND ORDER

GEORGE HOWARD, Jr., District Judge.

This action was instituted by First National Bank of Eastern Arkansas, a National Banking Association, (First National) against Robert M. Eubanks, III, Commissioner for the Insurance Department of the State of Arkansas (Commissioner Eubanks)[1] seeking a declaratory judgment. The jurisdiction of this Court is invoked pursuant to Title 28 U.S.C. §§ 1331 and 2201. The central issue for resolution is whether First National's debt cancellation agreements with borrowers, whereby any unpaid indebtedness is assumed by First National or cancelled at the borrowers' death, by resorting to a cash reserve, constitute the sale of insurance making the transaction subject to regulation by Arkansas's Insurance Department.

Subsidiary issues to be resolved are:

1. Whether debt cancellation contracts are incidental to traditional banking activities; and,

2. Whether debt cancellation contracts are in conflict with the McCarran–Ferguson Act, 15 U.S.C. § 1011 *et seq.*

### RELEVANT FACTS

On March 1, 1964, the United States Comptroller of the Currency issued the following regulation which appears in 12 C.F.R. 7.7495:

Debt Cancellation Contract. A national bank may provide for losses arising from cancellation of outstanding loans upon the death of borrowers. The imposition of an additional charge and the establishment of necessary reserves in order to enable the bank to enter into such debt cancellation contracts *are a lawful exercise of the powers of a national bank and necessary to the business of banking.* (Emphasis added)

In 1987, preparatory to entering into debt cancellation agreements with some of its customers, in lieu of the usual practice of credit life insurance coverage, First National formulated a plan and prepared documents for the contemplated debt cancellation venture[2] and advised the Insurance Department of the State of Arkansas, by letter, of its plans. On April 21, 1987, David V. Simmons, Assistant Commissioner and Chief Counsel for the Arkansas Insurance Department, advised First National by letter:

An agreement between the obligee and the obligor calling for the cancellation of obligations in the event of death, conditioned upon the payment of a fee, would not be 'insurance' ... and would not be regulated by this Department. If the debt were to be 'guaranteed' by any third party rather than cancelled, or if the bank was agreeing to extinguish an obligation no longer held by that bank, the agreement would be 'insurance' and, therefore, would be improper. Privity of contract is absolutely essential to the determination.

It also should be noted that the lender must not represent or imply in any manner that the Debt Cancellation Contract is insurance. Confusion and misrepresentation will expose the lending institution to sanctions by this Department.

After receipt of Commissioner Simmons' letter, First National began entering into debt cancellation agreements with some of

---

**1.** Arkansas Credit Insurance Association, an Arkansas not-for profit association composed of Arkansas Life Insurance Companies whose business includes the underwriting and sale of credit life and disability insurance, was granted leave to intervene in this proceeding. Commissioner Eubanks and the association will be referred to as defendants.

**2.** First National's procedure extends to the customer the option to select credit life insurance or the debt cancellation agreement. The fee for the agreement is essentially the same as that for credit life. Under the procedure, 30% of the fee will be placed in a reserve to handle the debt cancellation. Under the credit life procedure the Bank, as agent of the insurance carrier, receives 40% of the fee received from the borrower as its commission while the remaining 60% goes to the carrier as its commission and establishing a reserve account.

its customers.[3]  On July 27, 1987, First National received the following letter from Commissioner Simmons:

Dear Mr. Glover:

The Insurance Commissioner has been asked to review the opinion expressed to you on the above subject [debt cancellation contracts] in my letter of April 21, 1987.  Since this matter is being reviewed, we felt that you should be advised in that we could be planning to take some action based upon the April 21, 1987, letter.  If, in fact, you have already commenced to issue debt cancellation contracts, we would as a matter of information appreciate being copied with copies of your debt cancellation contracts and any mathematical formulas utilized to establish the reserves on those contracts.

I would appreciate hearing from you as soon as possible, and the Department will communicate directly with you in the event that the opinion expressed in my previous letter is revised.

On September 1, 1987, Commissioner Simmons advised Mr. Glover:

This letter is to inform you that the position of the insurance department on the above subject [debt cancellation contracts], as previously announced in my letter of April 21, 1987, has been reversed upon further research and review.  Ark.Stat.Ann. § 66–202 defines insurance as:

" ... a contract whereby one undertakes to indemnify another or pay a specified amount or provide a designated benefit upon terminable contingencies."

A review of the applicable treatises, cases from other jurisdictions, resolutions of the National Association of Insurance Commissioners dating back to 1964, and guidelines set by the Arkansas Supreme Court in the case of *West & Company v. Sykes*, 257 Ark. 245, 515 S.W.2d 635 (1974), lead to conclusion that the previous opinion must be reversed.

In the *West* case, the Arkansas Court determined that decisions on this issue must be made on a case-by-case basis in accordance with the evils to be regulated and the facts of each case.  It is apparent that the lending institution intends the issuance of debt cancellation contracts to be a profit-generator.  You have told us that you will charge the same as credit life insurors and will attempt to make the program actuarially sound by the utilization of a reserve liability established to cover the losses.  It is evident that you view the debt cancellation contract as an identical alternative to credit life insurance.  The Legislature of Arkansas has determined that credit life insurance is fraught with sufficient 'evil' as to make it worthy of its own chapter of the Insurance Code, separate from other forms of life insurance.  The history of abuses in the credit life industry nationwide indicates that the Legislature accurately viewed the need for regulation of this product.  As you aptly point out in your letter of July 28, 1987, the amount you can charge for this product, if not regulated by this Department, is unlimited.

Since you have previously instituted the debt cancellation program, at least in part relying on the April 21, 1987, letter, you may continue this coverage until the individual contracts' natural expiration date.  No new debt cancellation contract may be issued beyond the date of this letter, however.  Failure to honor this request will result in action being brought pursuant to Ark.Stat.Ann. § 66–2901, *et seq.*, Unauthorized Insurer.

Although First National asserted that national banks' activities and business ventures are controlled and regulated by the National Bank Act, 12 U.S.C. § 21, *et seq.*, the rules, regulations and interpretative rulings of the United States Comptroller of Currency; and that the laws, rules and regulations of the State of Arkansas have no binding effects, First National ceased

---

**3.**  The Board of Directors of First National on July 15, 1987, passed a resolution providing that debt cancellation agreements would be made available to borrowers on loans of $10,000 or less.

entering into debt cancellation agreements with borrowers pending a ruling by this Court on First National's request for a declaratory judgment.

Defendants argue, essentially, that First National's debt cancellation contract plan is, in reality, credit life insurance and, as such, constitutes the business of insurance and, thus, subject to the regulatory authority of the Arkansas Insurance Department pursuant to The McCarran–Ferguson Act, Title 15 U.S.C. § 1012.

## DISCUSSION

### I.

### THE BUSINESS OF BANKING

The National Bank Act, 12 U.S.C. § 24 (Seventh) provides:

" ... [A] national banking association ... shall have power:

Seventh. ... all such incidental powers as shall be necessary to carry on the business of banking...."

The United States Comptroller's Regulation of March 1, 1964, referred to above and found in 12 C.F.R. 7.7495 was issued pursuant to the comptroller's interpretation of Section 24 (Seventh). The comptroller of the currency, who is empowered by the Congress of the United States to regulate the banking industry, in issuing the regulation in question not only concluded that "debt cancellation contracts are a lawful exercise of the powers of a national bank and necessary to the business of banking", but obviously concluded the agreements are safe and constitute sound banking practices.[4]

In this Court's opinion, and accordingly so finds, the debt cancellation agreements proposed by First National are material and a vital asset to a bank's activity of loaning money on personal security. The general consensus appears to be that national banks possess those incidental powers that are necessary and essential to fulfilling and engaging effectively in traditional banking activities; and that national banks may not be subject to state laws and regulations which tend to impair the efficiency of these banks. *Arnold Tours, Inc. v. Camp,* 472 F.2d 427 (1st Cir.1972); *Independent Bankers Association of America v. Heimann,* 613 F.2d 1164 (D.C.1979).

The Arkansas Insurance Commissioner's major concern appears to be the fact that First National's debt cancellation agreements are similar to credit life insurance coverage; and that the State of Arkansas has concluded that "credit life insurance is fraught with sufficient 'evil' to make it worthy ... of regulation...." In essence, Arkansas' Insurance Department views First National's debt cancellation agreements essentially credit life insurance. A comparison of First National's agreement with credit life insurance discloses, however, that while there is some similarity between the two procedures, there is, in fact, a material difference between the two. For example:

1. Both credit life insurance and the debt cancellation agreements accomplish the same objective—the satisfaction of a debtor's obligation to the bank upon the debtor's death.

2. Under credit life insurance, a bank acts as agent for the credit life insurance company and receives a commission from the insurance company for this service. The third party to the relationship is the insured-borrower.

3. Under the debt cancellation agreements, the principals involved are only the bank and the debtor. The elimination of the third party, as required under the credit life coverage, would, indeed, seemingly benefit the borrower to the extent of reducing premiums paid for the coverage. In addition, there is essentially no risk assumed by the borrower given the fact that the bank has a duty to cancel the indebtedness upon receiving proof of death of the debtor irrespective of the bank's financial standing at the time; age of the debtor is not a material factor in determining wheth-

---

**4.** The Arkansas Supreme Court in *First National Bank of Leslie v. Stokes,* 134 Ark. 368, 203 S.W. 1026 (1918) recognized that national banks may exercise those powers "expressly granted, or which are incidental to carrying on the business for which they are established."

er a debtor may take advantage of the option to obtain debtor cancellation agreement coverage; nor is there a requirement that the borrower submit to a medical examination.

4. Significantly, there are no exclusions in the debt cancelling arrangement, as in credit life insurance coverage, which could, if applicable, excuse an insurance company from honoring a claim.

This Court is persuaded that the debt cancellation agreements are designed to protect loans, traditionally a banking activity, and, as such, the activity is an incidental power referred to in the incidental powers clause of the National Bank Act. In other words, the debt cancellation agreements are directly related to what the National Bank Act refers to as "the business of banking."

This Court is not persuaded that the alleged "evils"—inability of credit life insurance carrier, in case of insolvency, to honor or pay a financial institution upon the death of an insured-borrower, and the likelihood of a claimant, under a credit life policy, facing defensive tactics in the form of exclusions—are present under First National's debt cancellation agreements given the fact that the bank has a duty to cancel the debt upon notice of death of the borrower. Really, there are no defensive factors available to First National in the form of exclusions. Moreover, under the comptroller's regulation, First National is authorized to create "necessary reserves" as forms of self-protection. In addition, the comptroller of currency has the direct responsibility to monitor and regulate the activities of national banks in order to make sure that a national bank's operations are sound in all respects. In other words, the comptroller of currency is in a position to prevent any unsafe and unsound banking practices that might develop in connection with the debt cancellation agreements. It is plain that the proposed debtor cancellation agreement will be intertwined with the day-to-day functions of First National which are subject to scrutiny by federal regulators.

Finally, it appears that 12 U.S.C. § 1972, which precludes tying arrangements on the part of national banks, serves as an additional protective device against any abuse or misuse of debtor cancellation agreements. Section 1972 provides:

"A bank shall not in any manner extend credit ... on condition or requirement—

(A) that the customer shall obtain some additional ... service from such banks...."

In essence, this Court is not persuaded that Arkansas' concern about the likelihood of abuse and unethical practices, will develop, if First National's debtor cancellation agreements are instituted, is well founded.

## II.

### THE McCARRAN–FERGUSON ACT

■ The McCarran–Ferguson Act, 15 U.S.C.A. § 1012 provides:

(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance....

It has been generally considered that the basic objective of the McCarran–Ferguson Act is to authorize state regulation of the activities of insurance companies. See: *Securities and Exchange Commission v. National Securities, Inc., et al.,* 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969); 15 U.S.C. § 1011 *et seq.* Stated differently, "[t]he McCarran–Ferguson Act exempts from federal law only those state regulations that specifically regulate the 'business of insurance'...." See: *Bernstein v. Centaur Ins. Co.,* 606 F.Supp. 98 at 101 (S.D.N.Y.1984). What conduct of an entity constitutes the "business of insurance" is a federal question. *Fry v. John Hancock*

*Mutual Life Insurance Company,* 355 F.Supp. 1151 (D.C.Tex., 1973).

The prevailing view appears to stress that only "core activities" of a traditional insurance company—the underwriting and risk spreading functions come within the meaning of the term "business of insurance." See *Group Life and Health Insurance Company v. Royal Drug Company,* 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979).

In *Hahn v. Oregon Physicians Service,* 689 F.2d 840 (9th Cir.1982), the court observed:

> "The insurance contract involves a contractual relationship which exists when an insurer, for consideration, agrees to reimburse an insured for loss caused by designated contingencies. *See* Black's Law Dictionary 721 (5th Ed.1979). This underwriting and subsequent spreading of the policyholder's risk is the primary element of the insurance contract and is, therefore, the 'business of insurance'."

This Court is not persuaded that First National's debt cancellation agreements, which are not directly related to the "business of insurance", but are "incidental powers as shall be necessary to carry on the business of banking", fall within the ambit of the McCarran–Ferguson Act. See: *Independent Bankers Association of America v. Heimann,* 613 F.2d 1164, 1170 (D.C.Cir.1979) *cert. denied* 449 U.S. 823, 101 S.Ct. 84, 66 L.Ed.2d 26 (1980).

In *Heimann,* the court in responding to a challenge to the comptroller's regulation relating to credit life insurance as being in conflict with the McCarran–Ferguson Act, stated:

> Unlike other forms of insurance coverage, however, credit life insurance is a limited special type of coverage written to protect loans. In no way does it involve the operations of a general life insurance business.... Moreover, Congress has specifically granted national banks all incidental powers necessary to carry on the business of banking, 12 U.S.C. § 24 (1976)....

The Court in *Heimann* concluded that the assertion that the McCarran–Ferguson

Act "must be interpreted as prohibiting the credit life regulation" does not "fall within the structures of the statute." 613 F.2d at page 1170.

First National's debt cancellation agreements, as credit life insurance, "are a limited special type of coverage written to protect loans" which are incidental to those traditional powers necessary for national banks to carry on the business of banking efficiently on the one hand, and serve as a cost reduction for services offered by First National to borrowers on the other hand. In essence, First National is endeavoring to extend to its customers a service in connection with its loan operations. In the opinion of this Court, this finding is practically pivotal and dispositive in distinguishing the debt cancellation agreements as incidental to the "business of banking" from the assertion of defendants that such agreements constitute the "business of insurance."

Finally, defendants have cited the case of *Arnold Tours, Inc. v. Camp,* 472 F.2d 427 (1st Cir.1972) in support of their argument that First National's debt cancellation agreements are not within the concept of "business of banking". The Court deems it sufficient to state that *Arnold Tours, Inc. v. Camp, supra,* is simply not in point and defendants' reliance thereon is misplaced. *Arnold Tours, Inc., supra,* did not involve either debt cancellation agreements or credit life insurance, but related to a national bank's operation of a full scale travel agency which was found not to be an exercise of incidental powers referred to in the incidental powers clause of the National Bank Act, 12 U.S.C.A. §§ 24, 24 subd. 7.

## III.

## BY WAY OF SUMMARY

1. First National's debt cancellation agreements are a limited special type of coverage written to protect loans and fall within those incidental powers necessary to carry on the business of banking as secured to national banks under 12 U.S.C. § 24, (Seventh) (1976).

2. First National's debt cancellation agreements do not constitute the "business

of insurance" since it is plain that the procedure employed and the purpose for same are unrelated to the "business of insurance" and, as such, are not precluded by the McCarran–Ferguson Act.

3. To permit the Arkansas Insurance Commission to regulate First National's debt cancellation agreements would impede and frustrate First National's ability to engage effectively in the "business of banking." In essence, First National should be authorized to employ the debtor cancellation agreements with its customers as permitted by the United States Comptroller of the Currency under and pursuant to Regulation 12 C.F.R. 7.7495.

IT IS SO ORDERED.