968 F.2d 150
 60 USLW 2797
 AMERICAN LAND TITLE ASSOCIATION, New York State Land Title
Association, Plaintiff-Appellant,
v.
Robert L. CLARKE, in his official capacity as Comptroller of
the Currency, Office of the Comptroller of the
Currency, an agency of the United
States, Defendant-Appellee,
The Chase Manhattan Bank, N.A., Intervenor-Defendant-Appellee.
 No. 720, Docket 91-6235.
 United States Court of Appeals,
Second Circuit.
 Argued and Submitted Jan. 7, 1992.
Decided June 15, 1992.
 
 Sheldon E. Hochberg, Washington, D.C. (William T. Finley, Jr., Susan M. Damplo, Steptoe & Johnson, Washington, D.C., Glenn J. Pogust, Jacob, Medinger & Finnegan, New York City, of counsel), for plaintiff-appellant.
 Kay K. Gardiner, Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty., S.D.N.Y., Gabriel W. Gorenstein, Asst. U.S. Atty., of counsel), for defendant-appellee.
 Kent T. Stauffer, The Chase Manhattan Bank, N.A., Litigation Div., New York City, for intervenor-defendant-appellee.
 John J. Gill, Michael F. Crotty, American Bankers Ass'n, Washington, D.C., for amicus curiae American Bankers Ass'n.
 Before OAKES, Chief Judge, MESKILL and PRATT, Circuit Judges.
 OAKES, Chief Judge:
 
 
 1
 The issue in this appeal is whether two provisions of the National Bank Act, 12 U.S.C. §§ 92 and 24 (Seventh) (1988), permit national banks to engage in the title insurance agency business.
 
 I.
 
 2
 Appellants the American Land Title Association and the New York State Land Title Association (collectively ALTA), brought suit in the United States District Court for the Southern District of New York against appellees Robert L. Clarke, in his official capacity as Comptroller of the Currency, and the Office of the Comptroller of the Currency (collectively OCC), seeking declaratory and injunctive relief that would, inter alia, void a June 1989 OCC decision permitting The Chase Manhattan Bank, N.A. (Chase Manhattan) to engage in the title insurance agency business, and would direct the OCC to refrain from authorizing any other national bank from engaging in this business. Chase Manhattan subsequently intervened as a party defendant (OCC and Chase Manhattan are collectively referred to as OCC).
 
 
 3
 The OCC rendered the decision at issue in its role as regulator of national banks and administrator of national banking laws. The decision authorized Chase Manhattan to proceed with its proposal to establish two operating subsidiaries designed to sell title insurance, as agents, to borrowers and lenders in connection with real estate loans made by the bank and its affiliates. The proposal further provided that borrowers would not be obligated to buy title insurance through the subsidiaries, and a borrower's failure to use the subsidiaries would not affect Chase Manhattan's other dealings with the borrower. The OCC based its decision on an interpretive letter issued in 1986, OCC Staff Interpretive Letter No. 368, [1985-1987 Transfer Binder] Fed. Banking L.Rep. (CCH) p 85,538, at 77,836 (July 11, 1986), that allowed a national bank to act as agent in the sale of title insurance.
 
 
 4
 Mary Johnson Lowe, district judge, denied ALTA's motion for summary judgment and granted the OCC's motion for dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure. ALTA now appeals. For the reasons set forth below, we reverse.
 
 II.
 A. Validity of 12 U.S.C. § 92
 
 5
 We note at the outset the existence of some question, dating back at least to the 1950s, regarding the validity of 12 U.S.C. § 92. This question arose because in 1918, two years after section 92 was enacted, a revision and reenactment of section 5202 of the Revised Statutes of the United States omitted section 92. Neither the OCC nor ALTA are troubled by this issue. The Supreme Court, albeit in dicta, has mentioned that section 92 was omitted from the 1918 enactment but assumed it remained valid. Commissioner v. First Sec. Bank of Utah, 405 U.S. 394, 401 n. 12, 92 S.Ct. 1085, 1090 n. 12, 31 L.Ed.2d 318 (1972). Even Congress must have thought the provision valid because in Pub.L. No. 97-320, § 403(b), 96 Stat. 1469, 1511 (1982), it enacted an amendment to section 92 striking out some of its language. But the D.C. Circuit recently saw fit to add a new layer to this debate by declaring, sua sponte, that "section 92 has ceased to exist." Independent Ins. Agents of Am. v. Clarke, 955 F.2d 731, 739 (D.C.Cir.1992). Thus, we feel compelled to address this issue even though the parties neither briefed nor argued it.
 
 
 6
 Section 92 was enacted in 1916 as an amendment to section 13 of the Federal Reserve Act of 1913, Pub.L. No. 63-43, § 13, 38 Stat. 251, 263-64 (1913). Pub.L. No. 64-270, § 92, 39 Stat. 752, 753 (1916) The relevant portions provided as follows:
 
 
 7
 Section fifty-two hundred and two of the Revised Statutes of the United States is hereby amended so as to read as follows: "No national banking association shall at any time be indebted, or in any way liable, to an amount exceeding the amount of its capital stock at such time actually paid in and remaining undiminished by losses or otherwise, except on account of demands of the nature following:
 
 
 8
 "First. Notes of circulation.
 
 
 9
 "Second. Moneys deposited with or collected by the association.
 
 
 10
 "Third. Bills of exchange or drafts drawn against money actually on deposit to the credit of the association, or due thereto.
 
 
 11
 "Fourth. Liabilities to the stockholders of the association for dividends and reserve profits.
 
 
 12
 "Fifth. Liabilities incurred under the provisions of the Federal Reserve Act.
 
 
 13
 ....
 
 
 14
 "That in addition to the powers now vested by law in national banking associations ... any such association located and doing business in any place the population of which does not exceed five thousand inhabitants ... may ... act as the agent for any fire, life, or other insurance company...."
 
 
 15
 In 1918, Congress enacted the War Finance Corporation Act of 1918, Pub.L. No. 65-121, 40 Stat. 506 (1918). In Title I, Congress created the War Finance Corporation and detailed its structure and powers. The final section of Title I--section 20--provides, in its entirety:
 
 
 16
 Section fifty-two hundred and two of the Revised Statutes of the United States is hereby amended so as to read as follows:
 
 
 17
 "Sec. 5202. No national banking association shall at any time be indebted, or in any way liable, to an amount exceeding the amount of its capital stock at such time actually paid in and remaining undiminished by losses or otherwise, except on account of demands of the nature following:
 
 
 18
 "First. Notes of circulation.
 
 
 19
 "Second. Moneys deposited with or collected by the association.
 
 
 20
 "Third. Bills of exchange or drafts drawn against money actually on deposit to the credit of the association, or due thereto.
 
 
 21
 "Fourth. Liabilities to the stockholders of the association for dividends and reserve profits.
 
 
 22
 "Fifth. Liabilities incurred under the provisions of the Federal Reserve Act.
 
 
 23
 "Sixth. Liabilities incurred under the provisions of the War Finance Corporation Act." (Emphasis added.)
 
 
 24
 The italicized portions indicate the additions to section 5202 effected by the War Finance Corporation Act. Obviously, Congress omitted the remaining provisions of section 5202 that, in the Act of 1916, had followed immediately after the provision entitled "Fifth"--including the text of section 92.[1]
 
 
 25
 Contrary to the view of the D.C. Circuit, we believe that this omission was inadvertent and thus we do not interpret it as having effected a repeal of section 92. Congress did not expressly repeal section 92 when it enacted the War Finance Corporation Act. We recognize, however, that an amendment to a statute that omits certain provisions almost always reflects Congress' intent to repeal the omitted provisions. However, just as we do not blindly give effect to an express repeal of a statute, see In re Adamo, 619 F.2d 216, 222 (2d Cir.) (express repeal of statutory provision not given effect because to do so would enforce an obvious mistake and contravene both common sense and statutory purpose), cert. denied, 449 U.S. 843, 101 S.Ct. 125, 66 L.Ed.2d 52 (1980), we do not necessarily give effect to an omission. Indeed, "the rule that amendment 'to read as follows' repeals everything omitted" is only an "aid[ ] in the interpretation of statutes, not [a] syllogism[ ]. [It] must yield where [its] application would be inconsistent with the purposes of the statute." FTC v. Standard Motor Products, Inc., 371 F.2d 613, 617 (2d Cir.1967); see also S.E.C. v. C.M. Joiner Leasing Corp., 320 U.S. 344, 350-51 & n. 8, 64 S.Ct. 120, 123 & n. 8, 88 L.Ed. 88 (maxims of statutory construction are but aids to interpretation).
 
 
 26
 Thus, we next consider the purpose of the War Finance Corporation Act in general, and section 20 in particular. The text and its legislative history indicate that the purpose of the Act was to ensure that sufficient capital flowed to industries deemed necessary to the prosecution of World War I. As stated by then Secretary of the Treasury, W.G. McAdoo, in a written statement presented before the Senate Committee on Finance and included in the Senate Report, S.Rep. No. 286, 65th Cong., 2d Sess. 4 (1918):
 
 
 27
 The bill is purely a war measure designed to conserve the supply of labor and materials for the purposes of the war, and to help supply the war's financial requirements, and to give them a first claim on capital seeking investment in like manner as the war's material requirements have been given a first claim on production.
 
 
 28
 Congress sought to achieve this purpose by creating two institutional mechanisms: a War Finance Corporation and a Capital Issues Committee.[2] Among other things, the Act empowered the War Finance Corporation to make advances to banks who had loans outstanding to, or had purchased the bonds of, entities "whose operations shall be necessary or contributory to the prosecution of the war." War Finance Corporation Act of 1918, Pub.L. No. 65-121, § 7, 40 Stat. 506, 508 (1918). Thus, Congress intended the War Finance Corporation to serve as a conduit for channelling funds, generally via banks, to war industries.
 
 
 29
 That successful prosecution of the war was the sole purpose of the War Finance Corporation Act is underscored by the fact that it was a temporary measure. Section 1 provided that the Corporation's powers would terminate (with the exception of powers incidental to its liquidation and winding up), and section 206 provided that Title II would continue in effect only until, six months after the end of the war, with such date to be fixed by the President. Thus, the entire enactment was drafted to be virtually self-destructing.
 
 
 30
 We next focus on the purpose of section 20 of the War Finance Corporation Act, and begin with its legislative history. Section 20 was offered on the floor of the House by Representative Michael F. Phelan of Massachusetts during consideration of the House version of the bill, H.R. 10608. 76 Cong.Rec. 3804 (1918). The only explanation of the amendment was offered by Representative Claude Kitchin, who stated:
 
 
 31
 If we do not put in this provision, and make the change in the law which this amendment makes, it will tie the hands of the national banks from helping out these corporations.
 
 
 32
 ....
 
 
 33
 I think there were some of the committees that had this amendment under consideration and thought that this section of the Revised Statutes should not apply to this limitation.
 
 
 34
 Id. (statement of Rep. Kitchin). The amendment was agreed to without debate, and the House adopted its version of the bill.
 
 
 35
 The House bill and the Senate version, S. 3714, were then reconciled by a conference committee, which settled on a version that included section 20. The House conference report, H.R.Conf.Rep. No. 448, 65th Cong., 2d Sess. 19 (1918) (Statement of Managers), explained the effect of section 20 as follows:
 
 
 36
 This section provides that section 5202 of the Revised Statutes of the United States relating to the indebtedness of a national banking association shall not apply in the case of any liability incurred by such association under the provisions of the War Finance Corporation act. This provision does not appear in the Senate Bill. The conferees adopt the House section.
 
 
 37
 When the Senate version of this conference report, S.Doc. No. 211, 65th Cong., 2d Sess. (1918), was submitted to the Senate by Senator Simmons, the Senator explained the significant amendments incorporated from the House version of the bill, but he did not address the addition of section 20. 76 Cong.Rec. 4376-79 (statements of Sen. Simmons). Ultimately, both the Senate and House agreed to enact the conferees' version of the bill.
 
 
 38
 No mention of the insurance powers of national banks exists in the legislative history. Thus, the legislative history indicates that the sole purpose of the revision was to ensure that section 5202 did not apply to liabilities incurred by a national bank in connection with the War Finance Corporation.
 
 
 39
 This view of the purpose of section 20 is supported by the text of the provision, which shows that the only substantive addition to the existing version of section 5202 was the following paragraph: "Sixth. Liabilities incurred under the provisions of the War Finance Corporation Act." In sum, it is obvious from a reading of both section 20 in its entirety, and its legislative history, that the amendment was designed to further the general purpose of the Act by ensuring that national banks could obtain funds from the War Finance Corporation without running afoul of the requirement, contained in the opening paragraph of section 5202, that certain bank liabilities not exceed the capital requirements set forth in the section.
 
 
 40
 Given the purposes of the Act as a whole and section 20 in particular, we believe that Congress did not intend to alter the insurance agency powers of national banks when it enacted section 20. First, on a general level, it would be wholly incongruous for Congress to repeal a provision regarding the totally unrelated matter of insurance agency powers in an emergency measure directed at winning the war. Second, on a more specific level, it is highly unlikely that Congress' intent to render existing limits on national bank liabilities consistent with the operations of the War Finance Corporation would just happen to coincide with an intent to repeal provisions regarding national banks' insurance agency powers. Third, we cannot believe that Congress intended to make permanent changes to national banks' insurance agency powers in an act that by its terms would virtually self-destruct six months after the conclusion of the war. Fourth, if it actually was Congress' intent to effect such a permanent change to an unrelated area of law, we would expect some clue to this intent to appear somewhere in the legislative history, but we have searched it and it does not. Fifth, it would be--at least arguably--inconsistent for Congress to repeal a provision that, as we explain below, bars national banks in large towns from engaging in insurance agency activity when the primary purpose of Title I of the War Finance Corporation Act was to orient national bank activity towards financing war industries.
 
 
 41
 We also note that the structure of section 20 supports our view that section 92 was inadvertently omitted. The omission occurs precisely after the insertion of the new paragraph entitled "Sixth"--the provision that rendered the War Finance Corporation Act consistent with existing national banking law. This gives rise to the inference that the drafters of section 20 forgot to include the remainder of section 5202 after they inserted the new paragraph.
 
 
 42
 For these reasons, we believe the only rational interpretation of the words "amended so as to read as follows" is that, contrary to the general rule, they do not effect a repeal of 12 U.S.C. § 92. Thus, section 92 remains valid law. We now turn to the issues raised by the parties.
 
 B. Standard of Review
 
 43
 ALTA first questions the district court's application of the principles of deference to agency action set forth in Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-45, 104 S.Ct. 2778, 2787-83, 81 L.Ed.2d 694 (1984), because the OCC's decision to permit Chase Manhattan to sell title insurance took the form of an interpretive ruling rather than a regulation, as was the case in Chevron. We disagree. An OCC ruling interpreting a statute that it is charged with enforcing is entitled to deference in accordance with Chevron. See, e.g., Clarke v. Securities Indust. Ass'n, 479 U.S. 388, 403-04, 107 S.Ct. 750, 759, 93 L.Ed.2d 757 (1987) (citing Chevron with approval and deferring to the Comptroller's interpretation of the National Bank Act, given that the provision in question was ambiguous and the Comptroller's interpretation was reasonable); see also Securities Indust. Ass'n v. Clarke, 885 F.2d 1034, 1042 (2d Cir.1989) (acknowledging applicability of principles of deferential review to Comptroller's decision), cert. denied, 493 U.S. 1070, 110 S.Ct. 1113, 107 L.Ed.2d 1021 (1990); American Ins. Ass'n v. Clarke, 865 F.2d 278, 280-81 (D.C.Cir.1988). Thus, the test set forth in Chevron is fully applicable to the OCC decision at issue in this case.
 
 
 44
 Under Chevron, we must first decide "whether Congress has directly spoken to the precise question at issue." Chevron, 467 U.S. at 842, 104 S.Ct. at 2781. If, however, the statute is "silent or ambiguous with respect to the specific issue," id. at 843, 104 S.Ct. at 2782, then we will uphold the OCC's interpretation provided it is reasonable and not "arbitrary, capricious, or manifestly contrary to the statute." Id. at 844, 104 S.Ct. at 2782.
 
 C. Section 92
 
 45
 ALTA argues that the district court erred in upholding the OCC's view that 12 U.S.C. § 92 places no limitation on national banks' incidental powers under 12 U.S.C. § 24 (Seventh). ALTA contends that section 92 impliedly prohibits national banks from selling insurance--including title insurance--in towns with more than 5,000 inhabitants.
 
 
 46
 To determine the scope of section 92, we turn first to the relevant statutory language:
 
 
 47
 That in addition to the powers now vested by law in national banking associations organized under the laws of the United States any such association located and doing business in any place the population of which does not exceed five thousand inhabitants, as shown by the last preceding decennial census may, under such rules and regulations as may be prescribed by the Comptroller of the Currency, act as the agent for any fire, life, or other insurance company....
 
 
 48
 This provision obviously provides no explicit limitation on national bank activity. But the maxim of expressio unius est exclusio alterius, used as an aid to construction, leads to the conclusion that Congress intended to prohibit national banks located and doing business in towns with over 5,000 inhabitants from engaging in the insurance agency business. See, e.g., Water Transp. Ass'n v. ICC., 722 F.2d 1025, 1029 (2d Cir.1983). Applying this principle, had Congress intended to grant national banks located in towns with large populations the authority to sell insurance, it would never have limited the grant of authority in section 92 to national banks in locations with under 5,000 inhabitants. And if at the time of enactment Congress believed that all national banks--regardless of location--already possessed the authority to sell insurance, this provision would have been superfluous. Thus, we believe that the language of section 92 evinces Congress' intent to bar national banks that fall outside of the provision's geographical restrictions from acting as insurance agents.
 
 
 49
 This statutory construction, of course, would have to "yield to clear contrary evidence of legislative intent." National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974). But here, the legislative history lends support to our view of the statute. Although the legislative history of section 92 is sparse, two documents in particular shed light on the backdrop to Congress' enactment of this legislation in September 1916. The first document, published by the Federal Reserve Board in February 1916, is a letter from its counsel to the Governor of the Federal Reserve Board, opining that the insurance business did "not come within either the expressed or implied powers of national banks." 2 Fed.Res.Bull. 73, 74 (Feb.1916). The letter concluded with the following statement: "Any such extension of the powers of national banks must be left to the consideration of Congress." Id.
 
 
 50
 The second document is a June 1916 letter from the then Comptroller of the Currency, John Skelton Williams, to the Senate Banking Committee, in which he proposed an amendment to the National Bank Act. 53 Cong.Rec. 11001 (1916). In the letter, the Comptroller explained that "[n]ational banks are not given either expressly nor by necessary implication the power to act as agents for insurance companies." Id. Enclosed with the letter was a draft of a proposed amendment "designed to empower national banks located in towns of not over 3,000 population ... to act as agents for the placing of insurance policies." Id. The Comptroller explicitly stated that "from the standpoint of public policy and banking efficiency this authority should be limited to banks in small communities." Id. This letter was entered into the Congressional Record by the Chairman of the Senate Banking Committee, Sen. Robert L. Owen. Id. The Comptroller's amendment was ultimately enacted, albeit with the modification that national banks in towns with populations up to 5,000 could sell insurance. Id. at 11153.
 
 
 51
 These two documents indicate that when Congress enacted section 92, it did so in the belief that under existing banking law (specifically 12 U.S.C. § 24 (Seventh)) national banks had no authority to engage in insurance agency activities. Furthermore, the Comptroller's letter provided evidence that Congress intended to withhold from national banks, located in towns with over 5,000 inhabitants, the authority to sell insurance. Accordingly, the legislative history supports our construction of the statute.
 
 
 52
 Our view of the statute derives further support from Saxon v. Georgia Ass'n. of Independent Ins. Agents, 399 F.2d 1010 (5th Cir.1968). In Saxon, the court relied on section 92 to declare unlawful Comptroller Saxon's ruling that permitted a national bank to sell its borrowers "broad forms of automobile, home, casualty and liability insurance." Saxon, 399 F.2d at 1012. The court applied the principle of expressio unius est exclusio alterius, and analyzed the legislative history to interpret section 92 such that "national banks have no power to act as insurance agents in cities of over 5,000 population." Id. at 1013.
 
 
 53
 The OCC contends that Saxon is irrelevant to the issue before us.[3] The OCC attempts to distinguish Saxon on the ground that it did not involve a form of insurance, like title insurance, that is essential to a bank's ability to provide financing. The Saxon court, however, did not rest its decision on the nature of the insurance activities engaged in by the bank. Instead, as we have stated, it simply viewed section 92 as an expression of Congress' intent that "national banks have no power to act as insurance agents in cities of over 5,000 population." Id. at 1013.
 
 
 54
 The OCC also urges us to disregard Saxon because the D.C. Circuit in Independent Bankers Ass'n v. Heimann, 613 F.2d 1164 (D.C.Cir.1979), cert. denied, 449 U.S. 823, 101 S.Ct. 84, 66 L.Ed.2d 26 (1980), followed a different approach to interpreting section 92. The Heimann court held that section 92 did not bar a national bank from selling credit life insurance in a town with over 5,000 inhabitants. Id. at 1170. Although the court stated in a footnote that "[b]y its own terms, the statute does not address the authority of national banks in larger towns or cities to act as agents for life insurance companies", Id. at 1170 n. 18, it seems to have based its decision largely on the nature of credit life insurance rather than on the issue of whether section 92 impliedly operates as a bar to certain national bank activity. Thus, we see no reason to depart from our view of section 92.
 
 
 55
 Having determined that section 92 impliedly bars national banks in towns with more than 5,000 inhabitants from engaging in insurance agency activities in general, we must now decide whether this prohibition applies to title insurance activities in particular. Section 92 applies to national banks that "act as the agent for any fire, life, or other insurance company." 12 U.S.C. § 92 (emphasis added). We believe that this language makes inescapable the conclusion that Congress intended this provision to apply to "any ... insurance company," and a title insurance company surely is an insurance company. Id. Thus, section 92 impliedly bars national banks from engaging in the title insurance agency business.
 
 
 56
 The OCC again relies on Heimann, asserting that, like credit life insurance, title insurance activities are outside of section 92's limits on national bank activity. In upholding the OCC regulations at issue in Heimann, the court reasoned that "[u]nlike other forms of insurance coverage ... credit life insurance is a limited special type of coverage written to protect loans. In no way does it involve the operations of a general life insurance business." Heimann, 613 F.2d at 1170.
 
 
 57
 Heimann, however, does not persuade us that section 92 is inapplicable to a national bank's title insurance activities. First, as the Heimann court pointed out, credit life insurance is unique in that it protects only the lender's interest by insuring that his loan will be repaid even if the borrower dies. When a bank sells credit life insurance, it is similar to the bank demanding a higher price for the loan to compensate for its assumption of a risk inherent in any extension of credit made pursuant to a borrower's promise to pay--the risk that the borrower's death will render him personally incapable of repaying the loan. Title insurance, by contrast, insures the borrower's equity in the property as well as the bank's interest in the mortgage it holds. Second, Heimann's persuasiveness is further eroded by its scant analysis of section 92 and its failure to discuss the provision's legislative history. Thus, Heimann is not dispositive of section 92's bearing on a national bank's power to sell title insurance.
 
 D. Section 24 (Seventh)
 
 58
 In addition to the express powers granted national banks by the National Bank Act, Section 24 (Seventh) of the Act grants them "all such incidental powers as shall be necessary to carry on the business of banking." The OCC contends that under judicial interpretations of this provision, a bank's sale of title insurance, as agent, is "incidental" to the banking business within the meaning of section 24 (Seventh), and thus the OCC's decision is consistent with the National Bank Act.
 
 
 59
 Based on our interpretation of section 92, we see no need to determine the scope of section 24 (Seventh). We are guided by the principle that where two statutes conflict, the statute that addresses the matter under consideration in specific terms controls over one that does so in a general manner, unless of course Congress has manifested a clear intent to the contrary. See Crawford Fitting Co. v. J.T. Gibbons, Inc. 482 U.S. 437, 445, 107 S.Ct. 2494, 2499, 96 L.Ed.2d 385 (1987). We discern no evidence that Congress intended section 24 (Seventh) to control section 92. Thus, even if the general grant of power contained in section 24 (Seventh) were sufficiently broad to encompass the title insurance agency business, so construed the statute would have to yield to the specific limits on insurance activity contained in section 92. For this reason, we do not decide whether the title insurance agency business is "incidental" to banking within the meaning of section 24 (Seventh).
 
 III.
 
 60
 Because we find that section 92 prohibits national banks located and doing business in places with over 5,000 inhabitants from engaging in the title insurance agency business, we reverse the judgment of the district court and direct it to enter summary judgment for the appellants. To defer to the OCC in this case would flout Congressional intent--something we remain unwilling to do.
 
 
 61
 Reversed.
 
 
 
 [1]
 Indeed, the omission is reflected in the United States Code, which labels 12 U.S.C. § 92 "[o]mitted."
 
 
 [2]
 The Capital Issues Committee, whose functions were set forth in Title II, was designed to regulate the sale of new issues of securities. War Finance Corporation Act of 1918, Pub.L. No. 65-121, § 203, 40 Stat. 506, 513 (1918)
 
 
 [3]
 The OCC also contends that Saxon was wrongly decided. We disagree