United States Court of Appeals,
Fifth Circuit.

No. 92-2010.

VARIABLE ANNUITY LIFE INSURANCE CO., Plaintiff-Appellant,

v.

Robert L. CLARKE, Comptroller of the Currency, the Office of the
Comptroller of the Currency, the United States of America, NCNB
National Bank of North Carolina, Defendants-Appellees.

Aug. 26, 1993.

Appeal from the United States District Court for the Southern
District of Texas.

Before GOLDBERG, JOLLY, and WIENER, Circuit Judges.

GOLDBERG, Circuit Judge:

In an opinion letter issued on March 21, 1990, the Comptroller
of the Currency determined that § 24(7) of the National Bank Act,
which grants national banks the power to engage in incidental
activities necessary to the business of banking, authorizes
national banks to sell annuity contracts. The Comptroller also
concluded that 12 U.S.C. § 92, which permits national banks to act
as insurance agents in towns with less than 5,000 inhabitants, does
not limit national banks' power to sell insurance in towns with a
population of over 5,000; and in any case, that annuities are not
a form of insurance. The district court deferred to the
Comptroller's interpretation of §§ 92 and 24(7) of the National
Bank Act, 786 F.Supp. 639. We reverse, finding that under § 92 of
the Act, national banks may not sell annuities in cities with more
than 5,000 inhabitants.

We begin by giving a broad adumbration of our analysis. As a
threshold matter we affirm the existence of § 92. The D.C.

Circuit's finding that § 92 was "repealed" by Congress was recently rejected by the Supreme Court which found § 92 to be alive and well. The plain language of § 92, as interpreted by this court in *Saxon v. Georgia Association of Independent Insurance Agents,* 399 F.2d 1010 (5th Cir.1968), prohibits national banks from selling insurance products in towns with a population larger than 5,000. Because we conclude that annuities are a form of insurance, we hold that § 92 bars national banks from selling annuities in cities with a population larger than 5,000. The Comptroller's determination that banks may sell annuities pursuant to the "incidental" powers provision of the National Bank Act, 12 U.S.C. § 24(7), is erroneous because the specific limitation on national banks' power to sell insurance contained in § 92 controls the general grant of incidental powers in § 24(7).

## BACKGROUND

On August 8, 1989, NationsBank of North Carolina ("NCNB"), a national bank based in Charlotte, North Carolina, sought permission from the Comptroller of the Currency to sell fixed and variable annuity contracts through its wholly-owned subsidiary NationsBanc Securities. NCNB proposed to sell the annuity contracts as an agent for various life insurance companies in cities with more than 5,000 inhabitants. On March 21, 1990, the Comptroller issued an opinion letter approving NCNB's proposed sale of annuities, finding that the sale of annuities is within the power of national banks under the National Bank Act. The Comptroller reasoned that "[a]s part of their traditional role as financial intermediaries, banks have broad powers to buy and sell financial investment instruments

as agents for customers ... [and] [a]lthough annuities have historically been a product of insurance companies, they are primarily financial investments."

Challenging the Comptroller's approval of NCNB's proposed sale of annuities, the Variable Annuity Life Insurance Company ("VALIC") filed the instant lawsuit in the Southern District of Texas seeking declaratory and injunctive relief. VALIC is an insurance company which underwrites and sells fixed and variable annuity contracts in all fifty states, and would be in direct competition with the NCNB's sale of annuities. In its motion for summary judgment, VALIC argued that NCNB's proposed sale of annuities violates 12 U.S.C. § 92, which prohibits national banks from selling insurance products in towns with a population larger than 5,000. The Comptroller and the NCNB filed cross motions for summary judgment, claiming *inter alia* that § 92 does not limit the powers of national banks and that § 92 does not apply to the sale of annuities.

The district court granted appellees' cross motions for summary judgment, and denied VALIC's motion for summary judgment. The district court determined that it "must defer to the Comptroller's interpretation of the National Bank Act, so long as the interpretation is reasonable." Finding that the Comptroller's interpretation "was more than a reasonable construction," the district court affirmed the Comptroller's approval of the proposed annuities sale.

ANALYSIS

On appeal, the central question before us is whether 12 U.S.C. § 92 prohibits banks from selling annuities in cities with more

than 5,000 inhabitants. "When an appeal is taken from summary judgment, we review the district court's actions de novo, applying the same standard used by the district court. (citation omitted) When, as here, questions of law control the disposition on summary judgment, we must subject the controverted issues to full appellate review." *Texas Commerce Bank, Forth Worth, N.A. v. United States,* 896 F.2d 152, 155 (5th Cir.1990). *See also Farmers-Merchants Bank and Trust Co. v. CIT Group/Equipment Financing, Inc.,* 888 F.2d 1524, 1526 n. 3 (5th Cir.1989) (questions of law subject to de novo review).

Before discussing the applicability of § 92 to the facts of the instant case, we must first dispel any lingering existential doubts regarding § 92's viability. Section 92 of Title 12 was enacted in 1916 as part of the Act of Sept. 7, 1916, 39 Stat. 753. In *Independent Insurance Agents, Inc. v. Clarke,* 955 F.2d 731 (D.C.Cir.1992), the D.C. Circuit held that § 92 was repealed by Congress in 1918, and is no longer in force. The *Independent Insurance Agents* court found that the 1916 Act placed § 92 in Rev.Stat. § 5202, and that in 1918 Congress eliminated § 5202, thus eliminating § 92. Relying on the D.C. Circuit's analysis, the NCNB argues that § 92 does not exist.

While the appeal in the instant case was pending, the Supreme Court granted a writ of certiorari to review the D.C. Circuit's opinion in *Independent Insurance Agents.* Because the existence or nonexistence of § 92 is central to the disposition of the instant case, we withheld the issuance of this opinion while we waited for the Supreme Court to resolve the question raised by the D.C.

Circuit: whether § 92 was to be, or not to be. The answer has come: § 92 is to be. The Supreme Court rejected the D.C. Circuit's analysis, finding that "the 1916 Act placed § 92 not in Rev.Stat. 5202 but in § 13 of the Federal Reserve Act," and "since the 1918 Act did not touch § 13, it did not affect, much less repeal, section 92." *United States National Bank of Oregon v. Independent Insurance Agents of America,* --- U.S. ----, ----, 113 S.Ct. 2173, 124 L.Ed.2d 402, 417 (1993).

Having established the existence of § 92, we must next determine the applicability of § 92 to the sale of annuities by national banks in cities with a population greater than 5,000. Section 92 provides in relevant part that national banks,

> located and doing business in any place the population of which does not exceed five thousand inhabitants, as shown by the last preceding decennial census may, under such rules and regulations as may be prescribed by the Comptroller of the Currency, act as the agent for any fire, life, or other insurance company authorized by the authorities of the State in which such bank is located to do business in such state, by soliciting and selling insurance and collecting premiums on policies issued by such company.

Section 92 explicitly authorizes national banks in towns with a population smaller than 5,000 to act as insurance agents, and impliedly prohibits national banks in towns with a population larger than 5,000 from acting as insurance agents. In *Saxon v. Georgia Association of Independent Insurance Agents,* we reversed the Comptroller's ruling that "National banks have the authority to act as agent in the issuance of insurance" regardless of the size of the city in which they are operating. 399 F.2d 1010, 1012 (5th Cir.1968). We held that by application of the ancient maxim of *expressio unius est exlusio alterius* (the mention of one thing

implies the exclusion of another) it is clear that under § 92 "national banks have no power to act as insurance agents in cities of *over* 5,000 population." *Id.* at 1013.

The *Saxon* court's interpretation of § 92 was recently followed by the Second Circuit in *American Land Title Association v. Clarke,* 968 F.2d 150 (2nd Cir.) *cert. denied* --- U.S. ----, 113 S.Ct. 2959, 125 L.Ed.2d 660 (1993), which reversed a Comptroller's directive allowing national banks to act as agents for title insurance companies in cities with a population over 5,000. The Second Circuit adopted the reasoning of *Saxon,* also finding that the "maxim *expressio unius est exlusio alterius,* used as an aid to construction, leads to the conclusion that Congress intended to prohibit national banks located and doing business in towns with *over* 5,000 inhabitants from engaging in the insurance agency business." *Id.* at 155.

In interpreting the intended scope of § 92, the Second Circuit cogently deduced that "had Congress intended to grant national banks located in towns with a large population the authority to sell insurance, it would never have limited the grant of authority in section 92 to national banks in locations with under 5,000 inhabitants." *Id.* The reasoning of the *Saxon* and *American Land Title* courts, that an affirmative grant of a specific power includes a denial of powers not granted, relies on interpretive principles that are firmly ensconced in our jurisprudence. *See Botany Worsted Mills v. United States,* 278 U.S. 282, 289, 49 S.Ct. 129, 132, 73 L.Ed. 379 (1929) ("when a statute limits a thing to be done in a particular mode, it includes the negative of any other

mode"); *National R.R. Passenger Corp. v. Passengers Association,* 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974) (same); *Rogers v. Frito-Lay Inc.,* 611 F.2d 1074, 1085 (5th Cir.) (same) *cert. denied* 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980); *Midland Telecasting v. Midessa Television Co., Inc.,* 617 F.2d 1141, 1145 n. 7 (5th Cir.) (same) *cert. denied* 449 U.S. 954, 101 S.Ct. 361, 66 L.Ed.2d 219 (1980).

The *Saxon* and *American Land Title* courts' interpretation of § 92 is bolstered by the legislative history of § 92. The Chairman of the Senate Banking and Currency Committee inserted into the legislative record of § 92 a letter from the then Comptroller of Currency, John Skelton Williams. 53 Cong.Rec. 11001 (1916). In this letter the Comptroller recommended that Congress give national banks in small communities the authority to act as insurance agents, but the Comptroller added: "It seems desirable from the standpoint of public policy and banking efficiency that *this authority should be limited* to banks in small communities." *Id.* (emphasis added) The Comptroller explained that "in many small places the amount of insurance policies written or mortgages to be placed on commission is not sufficient to take up the entire time of an insurance broker, and the bank is not therefore likely to trespass upon outside business naturally belonging to others." *Id.*

The Comptroller and NCNB challenge the *Saxon* court's interpretation of § 92, claiming that § 92 does not limit the powers of national banks located in towns with a population larger than 5,000. The Comptroller's opinion letter states that it

"disagreed with the *Saxon* court's interpretive approach."[1]  Stare decisis notwithstanding, the district court deferred to the Comptroller's interpretation of § 92, finding that it is "neither arbitrary nor capricious to view 12 U.S.C. § 92 as a supplemental power provision and not a limitation on national banks ...," and that the Comptroller's interpretation of § 92 was "more than a "permissible construction.' "

The district court's deference to the Comptroller was based on its reading of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In *Chevron,* the Court outlined a two step analysis to be followed by courts reviewing an administrative agency's statutory interpretation:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter;  for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If however, the court determines that Congress has not addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. *Id.* at 842-43, 104 S.Ct. at 2781.

The district court deferred to the Comptroller's interpretation of § 92 because it found that Congress had not

---

[1]The two circuit cases cited by the Comptroller indicating disagreement with *Saxon, Independent Insurance Agents v. Board of Governors of the Federal Reserve System,* 736 F.2d 468, 477 n. 6 (8th Cir.1984) and *Independent Bankers Association v. Heimann,* 613 F.2d 1164, 1170 n. 18 (D.C.Cir.) *cert. denied* 449 U.S. 823, 101 S.Ct. 84, 66 L.Ed.2d 26 (1980), discuss *Saxon* only in dicta.

directly addressed the question at issue. While "[j]udicial deference to an agency's interpretation of ambiguous provisions of the statutes it is authorized to implement reflects a sensitivity to the proper roles of the political and judicial branches," *Pauley v. BethEnergy Mines, Inc.,* --- U.S. ----, ----, 111 S.Ct. 2524, 2534, 115 L.Ed.2d 604 (1991), such deference is not appropriate under *Chevron* if the intent of Congress is clear. The district court erred in reaching the second step of the *Chevron* analysis because our interpretation of § 92 in *Saxon* was based on the plain language of the statute which exhibits Congress' clear intent to permit only banks in towns with less than 5,000 inhabitants to sell insurance products. Federal courts are not to defer to an administrative agency's interpretation of a statute which frustrates the clear intent of Congress. *See Presley v. Etowah County Commissioner,* --- U.S. ----, 112 S.Ct. 820, 117 L.Ed.2d 51 (1992) ("we defer to an administrative interpretation of a statute ... only if Congress has not expressed its intent with respect to the question"); *Nicklos Drilling Co. v. Cowart,* 927 F.2d 828, 831-32 (5th Cir.1991) (en banc) (refusing to follow administrative agency's interpretation when words of statute are unambiguous).

NCNB questions the precedential value of *Saxon,* noting that the *Saxon* decision precedes *Chevron* by sixteen years. But regardless of the passage of time, deference under *Chevron* does not permit administrative agencies to overrule precedents. *See Lechmere, Inc. v. NLRB,* --- U.S. ----, ---- - ----, 112 S.Ct. 841, 847-848, 117 L.Ed.2d 79 (1992) ("once we have determined a statute's clear meaning, we adhere to that determination under the

doctrine of stare decisis, and we judge an agency's later interpretation of the statute against our prior determination of the statute's meaning"); *BPS Guard Services Inc. v. NLRB,* 942 F.2d 519, 523 (8th Cir.1991) ("*Chevron* does not stand for the proposition that administrative agencies may reject, with impunity, the controlling precedent of a superior judicial body"). While administrative agencies serve important functions, these do not include the occlusion of the positivistic declarations of this court.

It is plain from the language of the statute, and from the legislative history, that § 92 prohibits national banks, including the NCNB, from selling insurance products in towns with a population greater than 5,000. The NCNB and the Comptroller argue that even if § 92 prohibits NCNB from selling insurance in towns with a population greater than 5,000, this prohibition should not be applied to the instant case because "annuities are not insurance." We disagree; annuities are an insurance product, both historically and functionally.

The Comptroller concedes that "annuities have historically been a product of insurance companies," and Justice Brennan has likewise observed that "the granting of annuities has been considered part of the business of life insurance." *Securities and Exchange Comm. v. Variable Annuity Life Insurance Co.,* 359 U.S. 65, 81, 79 S.Ct. 618, 627, 3 L.Ed.2d 640 (1959). *See also Black's Law Dictionary,* (sixth ed. 1990) (classifying annuities as a type of insurance, and defining annuities as "*an insurance contract* calling for periodic payments to the insured or annuitant for a stated

period or for life") (emphasis added).

All fifty states currently regulate annuities under their insurance laws.[2] *See Securities and Exchange Comm. v. Variable*

---

[2]Ala.Code §§ 27-3-6(1), 27-5-3 (1986);

Alaska Stat. § 2109.060(1) (1990);

Ariz.Rev.Stat.Ann. § 20-254 (1990);

Ark.Stat.Ann. §§ 23-64—102(1), (3), (1987);

Cal.Ins.Code § 101 (1977);

Colo.Rev.Stat. § 10-1-102(7) (1990);

Conn.Gen.Stat. § 38-68t(a) (1990);

Del.Code Ann. tit. 18 § 512 (1989);

Fla.Stat.Ann. § 624.602(1) (1990);

Ga.Code Ann. § 33-7-4 (1990);

Haw.Rev.Stat. § 431:1-204 (1985);

Idaho Code §§ 41-103, 41-312 (1977);

Ill.Ins.Code ch. 73, art. I, § 4 (1982);

Ind.Code §§ 27-1-2-3(s) (1986);

Iowa Code § 508.31 (1990);

Kan.Stat.Ann. § 40-401 (1990);

La.Rev.Stat.Ann. § 22:6(1) (West 1969);

Me.Rev.Stat.Ann. tit. 24-A, § 411 (1990);

Md.Ins.Code Ann. Act 48A, §§ 46(1), 65 (1991);

Mass.Gen.L. ch. 175, § 47(16) (1987);

Mich.Comp.Laws Ann. § 500.602 (West 1990);

Minn.Stat.Ann. § 61A.01 (1986);

Miss.Code Ann. § 83-7-1 (1972);

Mo.Rev.Stat. §§ 375.158(2), 376.010 (1968);

*Annuity Life Ins. Co.,* 359 U.S. 65, 69, 79 S.Ct. 618, 621, 3 L.Ed.2d 640 (1959) ("all the States regulate "annuities' under

Mont.Code Ann. § 33-2-108(2) (1990);

Neb.Rev.Stat. § 44-201 (1990);

Nev.Rev.Stat. § 680A.110 (1988);

N.H.Rev.Stat.Ann. § 408:24 (1983);

N.J.Rev.Stat.Ann. § 17:17-1(c) (1990);

N.M.Stat.Ann. § 59A-7-2 (1988);

N.Y.Ins.Law § 1113(a)(2) (McKinney 1990);

N.C.Gen.Stat. §§ 58-7-15(2), 58-39-15(15) (1990);

N.D.Cent.Code. §§ 26.1-26-11(1), (18) (1990);

Ohio Rev.Code Ann. §§ 3902.02, 3911.01 (1990);

Okla.Stat. tit. 36 § 702 (1990);

Or.Rev.Stat. § 731.170(2) (1990);

40 Pa.Cons.Stat. § 382(a)(1) (1990);

R.I.Gen.Laws § 27-32-1(a) (1989);

S.C.Code Ann. §§ 38-1-20(7), (19) (1989);

S.D.Codified Laws Ann. § 58-6-20 (1990);

Tenn.Code Ann. § 56-2-201(4) (1986);

Tex.Ins.Code Ann. art. 3.01, § 1 (1981);

Utah Code Ann. § 31A-1-301(44)(d) (1991);

Vt.Stat.Ann. tit. 8, § 3717 (1984);

Va.Code Ann. § 38.2-602 (1986);

Wash.Rev.Code § 48.11.020 (1984);

W.Va.Code § 33-1-10(a) (1988);

Wis.Stat. §§ 71.42(3), 610.21(4) (1980);

Wyo.Stat. § 26-1-102(a)(xvi), (xvii), 26-16-101 (1983).

their "insurance' laws").  For example, Texas law defines a "life insurance company" to be a "corporation doing business under any charter involving ... [*inter alia* ] annuities."  Tex.Ins.Code, art. 3.01 § 1 (1981).  Federal laws also reflect the fact that annuities are an insurance product.  *See e.g.* Internal Revenue Code, 26 U.S.C. § 816(a) (a "life insurance company" is defined as "an insurance company which is engaged in the business of issuing life insurance and annuity contracts").

Annuities have historically been considered insurance products because functionally they are the mirror image of life insurance. In a life insurance contract, in return for periodic payments by the insured, the insurance company promises to pay a lump sum to the insured's beneficiary upon the death of the insured.  The insurance company determines the insurance premium by calculating the life expectancy of the insured, and gambles that the insured will outlive the actuarial prediction.  An annuity contract is the exact inverse of a life insurance contract.  In return for a lump sum, the insurance company typically promises the annuitant periodic payments that will continue until the death of the annuitant.  The lump sum is determined by the life expectancy of the annuitant, and, in this case, the insurance company gambles that the annuitant will die prior to the actuarial predictions.

Both life insurance and annuities are formulated on the basis of actuarial calculations of mortality risk.  The Supreme Court, in *Group Life & Health Ins. Co. v. Royal Drug Co.,* recognized that "[i]nsurance is an arrangement for transferring and distributing risk."  440 U.S. 205, 211, 99 S.Ct. 1067, 1073, 59 L.Ed.2d 261

(1979) (quoting R. Keeton, *Insurance Law* § 1.2(a) (1971)). Both life insurance and annuities transfer the economic risk of death from the policyholder to the insurance company. Life insurance protects the insured against the economic risk of the insured's dying prematurely, while an annuity contract protects the insured against the possibility of outliving her resources.[3] By issuing numerous life insurance and annuity contracts, an insurance company spreads the risk of policyholders living longer or shorter than predicted.[4]

Because annuities are insurance products, and § 92 prohibits national banks from selling insurance products in towns with a population greater than 5,000, the Comptroller's approval of NCNB's sale of annuities conflicts with § 92. The Comptroller attempts to circumvent this result by arguing that even if annuities are insurance products, "they are not the kind of "fire, life or other insurance' to which section 92 refers and which *Saxon* addressed." The Comptroller attempts to distinguish *Saxon* by arguing that § 92

---

[3]S.S. Huebner and K. Black, *Life Insurance,* explain that life insurance and annuities "are both insurance in the true sense of the term. Life insurance protects against the absence of income in the event of premature death or disability, whereas the annuity protects (insures) against the absence of income on the part of those "afflicted' with undue longevity. Both mean dependable protection to two unfortunate groups, the one dying to soon and the other living too long. They are both insurance arrangements, the one pertaining to the years of ascendancy, and the other to the years of decline."

[4]This analysis applies to both variable and fixed annuities. The Comptroller explains that "[b]oth fixed and variable annuities can provide investors with a stream of payments for life, and both can involve actuarial calculations. The only difference is that fixed annuities, by providing a guaranteed long-term return, offer a "reduced level of investment risk for the customer.' "

does not apply to "specialized' insurance products like annuities, but only "to types of insurance that are similar to fire and life insurance, such as other general casualty insurance policies." The district court agreed with the Comptroller's finding that annuity contracts are "a specialized insurance product and not a "broad form' of insurance to which *Saxon* applied."

The Comptroller's argument, that § 92 only applies to "general" types of insurance, was rejected by the Second Circuit in *American Land Title.* The Second Circuit opined: "We believe [the language of § 92] makes inescapable the conclusion that Congress intended this provision to apply to "*any* ... insurance company.' " 968 F.2d at 156. (emphasis added) We agree with the Second Circuit. The language of § 92 addresses the powers of banks to act as the agents of "any fire, life *or other insurance* company." Nowhere does § 92 limit "other insurance" to "general" insurance, nor does § 92 speak of "broad forms" of insurance. Nothing in § 92 requires that we engage in the necessarily arbitrary exercise of examining whether a particular type of insurance product conforms to a platonic form of "general" insurance. Moreover, on its own facts, *Saxon* applied to "automobile, home, casualty and liability insurance." 399 F.2d at 1012. Likewise, the recent Second Circuit case following *Saxon* struck down the sale of title insurance. Annuities are certainly no less a "general" type of insurance than land title insurance or automobile insurance.

The Comptroller also attempts to analogize annuities to credit life insurance which, according to the D.C. Circuit, national banks are permitted to sell. *Independent Bankers Association v. Heimann,*

613 F.2d 1164 (D.C.Cir.1979). The analogy has no merit. Credit life insurance secures the repayment of the borrower's indebtedness, and thus is intimately related to the bank's primary business of lending. As the Second Circuit court explains,

> credit life insurance is unique in that it protects only the lender's interest by insuring that his loan will be repaid even if the borrower dies. When a bank sells credit life insurance it is similar to the bank demanding a higher price for the loan to compensate for its assumption of a risk inherent in any extension of credit made pursuant to a borrower's promise to pay—the risk that the borrower's death will render him personally incapable of repaying the loan. *American Land Title,* 968 F.2d at 157.

By contrast to credit life insurance, which is closely related to the business of banking, annuities have nothing to do with the primary business of banking.

The Comptroller and NCNB finally argue that regardless of § 92, § 24(7) of the National Bank Act authorizes banks to sell annuities. Section 24(7), originally enacted as part of the National Bank Act of 1864, ch. 106, 13 Stat. 99, 101, codified at 12 U.S.C. § 24(7), grants to national banks "all such incidental powers as shall be necessary to carry on the business of banking." The Comptroller argues that the selling of annuities is an "incidental power" granted to national banks under § 24(7). The comptroller's argument ignores the rest of the quoted sentence, i.e., "necessary to carry on the business of banking." Even conceding arguendo that the power to sell annuities would be one incidental to banking, by no stretch of the imagination can that power be deemed "necessary." Moreover, the Comptroller's argument, claiming that Congress implicitly gave national banks the power to sell annuities under the general provision of § 24(7), ignores the

import of § 92. Even if § 24(7) can be interpreted as granting national banks the power to sell annuities, it is a basic principle of statutory construction that "where two statutes conflict, the statute that addresses the matter under consideration in specific terms controls over the one that does so in a general manner." *American Land Title Association,* 968 F.2d at 157. As we explained in *Saxon:*

> In interpreting the meaning of one provision of an act it is proper that all other provisions in *pari materia* should also be considered. So in construing the general authority contained in Section 24(7) we must give equal consideration to Section 92 as it specifically deals with the power of national banks to act as insurance agents. 399 F.2d at 1013.

*See Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 445, 107 S.Ct. 2494, 2499, 96 L.Ed.2d 385 (1987) ("where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one"); *Busic v. United States,* 446 U.S. 398, 406, 100 S.Ct. 1747, 1753, 64 L.Ed.2d 381 (1980) ("a more specific statute will be given precedence over a more general one, regardless of their temporal sequence").

We have previously considered and rejected the Comptroller's argument that § 24(7) grants national banks powers that are denied by § 92. In *Saxon* we held that "when the general language in Section 24(7) dealing with "incidental' powers is construed in conjunction with the specific grant in section 92," *id.* at 1013, section 92 controls. A "power which has been withheld or denied by Congress cannot be found to exist as an "incidental' and "necessary' power." *Id.* at 1014. The same conclusion was reached by the Second Circuit, which found that the "specific limits on insurance activity contained in section 92" control "the general

grant of power contained in section 24 (seventh)." *American Land Title,* 968 F.2d at 157.

In addition to the statutory construction outlined above, the legislative history of § 92 clearly indicates that § 24(7) did not grant banks the power to sell insurance products. Section 24(7) was enacted in 1864, as part of the original National Bank Act. "Prior to the 1916 enactment of Section 92 it seems to have been universally understood that no national banks possessed *any* power to act as insurance agents." *Saxon,* 399 F.2d at 1013. In a 1915 ruling, the Federal Reserve Board stated that "National banks have no express or implied power to write fire, cyclone, liability, or other kinds of insurance." 2 Fed. Reserve Bull. 73, 74 (1916). In 1916, the then Comptroller of the Currency John Skelton Williams ruled that "National banks are not given either expressly nor by necessary implication the power to act as agents for insurance companies." 53 Cong.Rec. 11001 (1916). It was precisely the national banks' lack of power to sell insurance under § 24(7) which prompted Comptroller Williams to recommend that Congress grant national banks located in towns with a population not exceeding 5,000 people the power to act as insurance agents. The Congress adopted the recommendation of Comptroller Williams, and enacted § 92 as part of the National Bank Act of 1916. Reviewing this history, we concluded in *Saxon:*

> It thus appears to be clear from the contemporaneous legislative history of Section 92 that Congress agreed with and acquiesced in the then Comptroller's ruling that "National banks are not given either expressly nor by necessary implication the power to act as agents for insurance companies.' 399 F.2d at 1016.

If § 24(7) had authorized banks to sell insurance products,

Congress would not have needed to add § 92 which grants national banks the limited power to sell insurance in towns with less than 5,000 inhabitants. If § 24(7) authorized banks to sell insurance products, the limited grant of such a power under § 92 would be partially redundant (for cities with a population under 5,000), and partially contradictory (for cities with a population over 5,000). Obviously, § 92 reflects Congress' understanding that the general grant of "incidental" power under § 24(7) did not include the power to sell insurance.

CONCLUSION

Our interpretation of § 92 and § 24(7) largely follows our interpretation of these provisions in *Saxon.* In the 25 years that have past since this court interpreted § 92 and § 24(7) in *Saxon,* Congress has taken no step to overrule or modify this interpretation. We end our opinion by giving banks seeking more power than they are currently granted under §§ 92 and 24(7) the same advice given by Judge Homer Thornberry at the conclusion of his concurring opinion in *Saxon:* "banks should look to Congress, not the Comptroller." 399 F.2d 1021. To Judge Thornberry's admonition we simply add, "... or the courts." We thus REVERSE the finding of the district court and hold that the March 21, 1990 decision of the Comptroller permitting NCNB to sell annuities in towns with more than 5,000 inhabitants is in violation of 12 U.S.C. § 92.